IN THE SUPREME COURT OF NORTH CAROLINA

No. 251PA18

Filed 14 June 2019

SUSAN SYKES d/b/a ADVANCED CHIROPRACTIC AND HEALTH CENTER, DAWN PATRICK, TROY LYNN, LIFEWORKS ON LAKE NORMAN, PLLC, BRENT BOST, and BOST CHIROPRACTIC CLINIC, P.A.

v.

HEALTH NETWORK SOLUTIONS, INC. f/k/a CHIROPRACTIC NETWORK OF THE CAROLINAS, INC., MICHAEL BINDER, STEVEN BINDER, ROBERT STROUD, JR., LARRY GROSMAN, MATTHEW SCHMID, RALPH RANSONE, JEFFREY K. BALDWIN, IRA RUBIN, RICHARD ARMSTRONG, BRAD BATCHELOR, JOHN SMITH, RICK JACKSON, and MARK HOOPER

On discretionary review pursuant to N.C.G.S. § 7A-31, prior to a determination by the Court of Appeals, of orders and opinions dated 18 August 2017 and 5 April 2018 entered by Judge James L. Gale, Chief Business Court Judge, in Superior Court, Forsyth County, after the case was designated a mandatory complex business case by the Chief Justice under N.C.G.S. § 7A-45.4. Heard in the Supreme Court on 5 March 2019.

> *Oak City Law LLP, by Samuel Pinero II and Robert E. Fields III; and Doughton Blancato PLLC, by William A. Blancato, for plaintiff-appellants.*

> *Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Jennifer K. Van Zant, Benjamin R. Norman, and W. Michael Dowling, for defendant-appellees.*

HUDSON, Justice.

Plaintiffs appeal the North Carolina Business Court's 18 August 2017 order and opinion granting in part and denying in part defendants' motions to dismiss and

for partial summary judgment and its 5 April 2018 order and opinion dismissing plaintiffs' remaining claims under Rule of Civil Procedure 12(b)(6). Plaintiffs are licensed chiropractic providers in North Carolina who allege that defendants Health Network Solutions, Inc. (HNS) and HNS's individual owners have engaged in unlawful price fixing ultimately resulting in a reduction of output of chiropractic services in North Carolina. Specifically, plaintiffs allege that defendant HNS has committed antitrust and other violations in its role as intermediary between individual chiropractors and several insurance companies and third-party administrators,[1] who are the defendants in a separate action also before this Court.

In their Second Amended Class Action Complaint (the second amended complaint), plaintiffs raise the following claims for relief: (1) declaratory judgment, (2) price fixing, monopsony, and monopoly (the antitrust claims), (3) unfair and deceptive trade practices and acts, (4) civil conspiracy, and (5) breach of fiduciary duty. In addition, plaintiffs seek punitive damages, a remedy styled in the complaint as a separate claim for relief.

Today, we affirm the Business Court's dismissal of plaintiffs' antitrust claims, including the derivative claim of civil conspiracy, by an equally divided vote, meaning that the Business Court's opinion as to those claims will stand without precedential

---

[1] Plaintiffs refer to these entities as the Insurers, while defendants refer to them as the Payors. Several of these entities are defendants in a separate action filed by the same plaintiffs on 26 May 2015. An appeal from the Business Court in that companion case, *Sykes v. Blue Cross & Blue Shield of North Carolina* (No. 248A18) (*Sykes II*), is also before this Court.

value. We also hold that the Business Court did not err in dismissing each of plaintiffs' other claims. As for plaintiffs' unfair trade practices claim, we hold that this claim is barred by the learned profession exemption set out in N.C.G.S. § 75-1.1(b). Regarding plaintiffs' declaratory judgment claim, we hold that the relevant statutes do not provide plaintiffs a private right of action to obtain the declaratory relief that they seek. As for plaintiffs' breach of fiduciary duty claim, we hold that no fiduciary relationship existed between the parties, meaning no fiduciary duty was ever created. The Business Court correctly noted that no freestanding claim exists for punitive damages, *see Funderburk v. JPMorgan Chase Bank, N.A.*, 241 N.C. App. 415, 425, 775 S.E.2d 1, 8 (2015), and plaintiffs have no remaining legal claim to which punitive damages might attach. As so described, we affirm the decision of the Business Court dismissing plaintiffs' entire action.

<u>Factual and Procedural Background</u>

Plaintiffs brought this action as a putative class action lawsuit, defining the class as "all licensed chiropractors practicing in North Carolina from 2005 to the present who provided services in the North Carolina Market" and identifying as three subsets of that class all licensed chiropractors participating in the HNS Market, the Comprehensive Health Market, and the Insurance Market. Plaintiffs made the following allegations in their second amended complaint, and for the purposes of our review they are taken as true.

Defendant HNS serves as an intermediary between individual chiropractors in North Carolina and various insurance companies and third-party administrators for insurance companies. Essentially, HNS contracts with various chiropractors, who, as part of the HNS network, are able to provide chiropractic services "in-network" for the various insurance payors with whom HNS has separately contracted. In exchange for in-network access, members of the HNS network agree to permit HNS to negotiate with the payors the prices to be charged for in-network chiropractic services. A chiropractor must maintain an average per-patient cost at a certain level or risk termination from the network. Individual defendants are themselves licensed chiropractors who are current or former owners of HNS.

Plaintiffs are licensed North Carolina chiropractors (and their businesses) who previously participated in the HNS network or have never participated in the network. Plaintiffs fall within one of these three categories: they were removed from the HNS network because their per-patient cost was too high, left the network based on HNS's policies, or declined to join the network because of HNS's practices and restraints. Plaintiffs argue that because HNS is the sole path to becoming an in-network provider for the various participating insurance companies and other payors, they are being deprived of access to the large number of patients that receive health care coverage via the networks of the various payors.

Plaintiffs' claims are largely based on the following allegations. Plaintiffs contend that HNS, despite representing that it is an integrated independent practice

association (IPA), in fact "operat[es] an involuntary cartel to control competition, supply, and pricing of chiropractic services in North Carolina made possible by the exclusive contracts with the Insurers and the market power provided by those contracts." Plaintiffs contend that HNS is operating as a medical service corporation, as described in N.C.G.S. § 58-65-1, that has not become licensed as required by N.C.G.S. § 58-65-50. In addition, they contend that HNS is conducting utilization review based only on providers' average per-patient cost, which does not take into account medical necessity or appropriateness of treatment, in violation of N.C.G.S. § 58-50-61 (2017). Thus, they contend, in addition to its failure to obtain proper licensure, HNS is violating North Carolina's antitrust statutes by fixing the prices charged by more than one-half of the licensed chiropractors in the state and by monopsony, a buyer-side form of monopoly,[2] in which, rather than using its market power as a sole seller to increase the price of services, HNS is using its market power as a buyer of those services to restrict output of services. Plaintiffs allege four relevant markets that have been adversely affected by the conduct of defendant HNS: the North Carolina market, defined as the market for chiropractic services provided

---

[2] Monopsony is "a market situation in which one buyer controls the market." *In re* Duke Energy Corp., 232 N.C. App. 573, 583, 755 S.E.2d 382, 389 (2014) (quoting BLACK'S LAW DICTIONARY 1023 (7th ed. 1999)). "[A] monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'" *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320, 127 S. Ct. 1069, 1075, 166 L. Ed. 2d 911, 919 (2007) (citing Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony*, 76 CORNELL L. REV. 297, 301, 320 (1991) and Thomas A. Piraino, Jr., *A Proposed Antitrust Approach to Buyers' Competitive Conduct*, 56 HASTINGS L.J. 1121, 1125 (2005)).

in North Carolina, and three submarkets within the North Carolina Market. Those submarkets are (1) the HNS Market, "the market in which in-network managed care chiropractic services . . . are provided to the Insurers and their North Carolina patients through HNS"; (2) the Comprehensive Health Market, "the market for in-network chiropractic services provided to individual and group comprehensive healthcare insurers and their patients in North Carolina"; and (3) the Insurance Health Market, "the market for insurance reimbursed chiropractic services in North Carolina."

The original complaint in this action was filed on 30 April 2013, and the case was designated a mandatory complex business case on 31 May 2013, before passage of the Business Court Modernization Act (BCMA). The BCMA established that, for all cases designated as mandatory complex business cases after 1 October 2014, appeals from the North Carolina Business Court would come directly to this Court, rather than to the Court of Appeals. A second action involving essentially the same factual allegations and similar legal claims, *Sykes v. Blue Cross & Blue Shield of North Carolina* (*Sykes II*), was filed after the effective date of the BCMA, and therefore the appeal in that case lay in this Court. We granted review of this case before a determination by the Court of Appeals, thus giving us jurisdiction over the appeals in both *Sykes* actions. Plaintiffs filed a motion to consolidate the two actions in the Business Court, which the Business Court never addressed before dismissing both lawsuits entirely.

The Business Court dismissed the claims here (*Sykes I*) in two different stages. Several months after plaintiffs filed their first amended complaint, the court on 5 December 2013 ordered limited discovery on the issue of market definition for the purposes of plaintiffs' antitrust claims. This limited discovery took place between February 2014 and August 2015. Following fact and expert discovery on market definition, plaintiffs filed their *Sykes II* complaint on 26 May 2015 and their second amended complaint in this action on 16 July 2015. Defendants here filed a motion to dismiss and for partial summary judgment, which the court granted in part and denied in part in its 18 August 2017 order and opinion. In that document, the court granted summary judgment for defendants on any claims stemming from their participation in plaintiffs' three proffered relevant submarkets but denied summary judgment on antitrust claims related to the North Carolina Market and on other claims connected to those remaining antitrust claims. The court also dismissed plaintiffs' breach of fiduciary duty claim as well as plaintiffs' claim for declaratory relief to the extent that claim was based on violations of Chapter 58. Finally, the court ordered supplemental briefing on whether plaintiffs had adequately alleged market power within the one relevant market, the North Carolina Market. Following receipt of that supplemental briefing, the court filed a second decision on 5 April 2018 dismissing all of plaintiffs' remaining claims. Plaintiffs appeal from both the 18 August 2017 and the 5 April 2018 orders and opinions of the Business Court.

Analysis

I.    Standard of Review

This Court reviews de novo legal conclusions of a trial court, including orders granting or denying a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) or a motion for summary judgment under Rule 56. *See, e.g., Azure Dolphin, LLC v. Barton*, ___ N.C. ___, ___, 821 S.E.2d 711, 725 (2018); *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012).

"We review a dismissal under Rule 12(b)(6) de novo, 'view[ing] the allegations as true and . . . in the light most favorable to the non-moving party.' Dismissal is proper when the complaint 'fail[s] to state a claim upon which relief can be granted.' 'When the complaint on its face reveals that no law supports the claim . . . or discloses facts that necessarily defeat the claim, dismissal is proper.' " *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017) (first, second, and fourth alterations in original) (first quoting *Kirby v. N.C. DOT*, 368 N.C. 847, 852, 786 S.E.2d 919, 923 (2016); then quoting *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 448, 781 S.E.2d 1, 7-8 (2015) (third alteration in original)). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2017). "All facts

asserted by the adverse party are taken as true, and their inferences must be viewed in the light most favorable to that party. The showing required for summary judgment may be accomplished by proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense . . . ." *Variety Wholesalers*, 365 N.C. at 523, 723 S.E.2d at 747 (ellipsis in original) (quoting *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000)). Thus, we do not defer to the conclusions of the Business Court but conduct our own independent inquiry into the legal issues that resulted in the Business Court's orders dismissing all of plaintiffs' claims. We now affirm the Business Court's rulings for the reasons set out below.

II.    Antitrust Claims

As to plaintiffs' antitrust claims, the members of the Court are equally divided; accordingly, the decision of the Business Court on these claims stands without precedential value. *See, e.g.*, *Faires v. State Bd. of Elections*, 368 N.C. 825, 825, 784 S.E.2d 463, 464 (2016) (per curiam) (affirming on this basis the judgment of a three-judge panel of the Superior Court, Wake County); *Burke v. Carolina & Nw. Ry. Co.*, 257 N.C. 683, 683, 127 S.E.2d 281, 281 (per curiam) (1962) ("The other Justices, being equally divided as to the propriety of the nonsuit, the judgment of the superior court is affirmed without the decision becoming a precedent."); *see also Piro v. McKeever*, 369 N.C. 291, 291, 794 S.E.2d 501, 501 (2016) (per curiam) (affirming a Court of Appeals opinion without precedential value by an equally divided vote); *CommScope*

*Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 56, 790 S.E.2d 657, 663 (2016) (same).

III.    Unfair Trade Practices

Plaintiffs allege that defendants have committed a number of unfair trade practices in violation of N.C.G.S. § 75-1.1. Some of these allegations describe the same conduct that is the subject of plaintiffs' antitrust claims. Thus, per our discussion above, to the extent that these allegations overlap, we affirm the trial court's dismissal of plaintiffs' N.C.G.S. § 75-1.1 claims. Plaintiffs' remaining allegations under section 75-1.1 are rooted in various provisions of the Insurance Law, found in Chapter 58 of the North Carolina General Statutes. Specifically, plaintiffs allege that HNS has engaged in unfair trade practices through its failure to meet the licensure and utilization review requirements set out in N.C.G.S. §§ 58-65-50 and 58-50-61 and through other acts, which plaintiffs contend fall within the unfair and deceptive *insurance* practices that are catalogued at N.C.G.S. § 58-63-15. We do not need to directly address whether the alleged violations of Chapter 58 can support plaintiffs' claims of unfair trade practices because we conclude, as the Business Court did, that plaintiffs' claims are barred by the learned profession exemption.[3]

Section 75-1.1 states, in pertinent part:

---

[3] We will address plaintiffs' reliance on the Insurance Law further in our discussion of their claims for declaratory relief.

  (a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

  (b) For purposes of this section, "commerce" includes all business activities, however denominated, *but does not include professional services rendered by a member of a learned profession.*

. . . .

  (d) Any party claiming to be exempt from the provisions of this section shall have the burden of proof with respect to such claim.

N.C.G.S. § 75-1.1 (2017) (emphasis added).

This Court has not previously addressed the language of section 75-1.1(b) exempting professional services rendered by "learned professionals" from the coverage of our state's unfair and deceptive trade practices (UDTP) statute. However, as our Court of Appeals has recognized, we conduct a two-part inquiry to determine whether the "learned profession" exemption applies: "[F]irst, the person or entity performing the alleged act must be a member of a learned profession. Second, the conduct in question must be a rendering of professional services." *Wheeless v. Maria Parham Med. Ctr., Inc.*, 237 N.C. App. 584, 589, 768 S.E.2d 119, 123 (2014) (quoting *Reid v. Ayers*, 138 N.C. App. 261, 266, 531 S.E.2d 231, 235 (2000)), *appeal dismissed and disc. rev. denied*, 368 N.C. 247, 771 S.E.2d 284 (2015). In determining what sort of conduct is exempted, the Court of Appeals has also explained that "a matter affecting the professional services rendered by members of a learned profession

. . . falls within the exception in N.C.G.S. § 75-1.1(b)." *Burgess v. Busby*, 142 N.C. App. 393, 407, 544 S.E.2d 4, 11-12 (citations omitted), *appeal dismissed*, 353 N.C. 525, 549 S.E.2d 216, *and disc. rev. improvidently allowed per curiam*, 354 N.C. 351, 553 S.E.2d 679 (2001).

Our Court of Appeals has long held that members of health care professions fall within the learned profession exemption to N.C.G.S. § 75-1.1, and "[t]his exception for medical professionals has been broadly interpreted." *Shelton v. Duke Univ. Health Sys., Inc.*, 179 N.C. App. 120, 126, 633 S.E.2d 113, 117 (2006) (first citing *Phillips v. A Triangle Women's Health Clinic, Inc.*, 155 N.C. App. 372, 377-79, 573 S.E.2d 600, 604-05 (2002); then citing *Burgess*, 142 N.C. App. 393, 544 S.E.2d 4 (2001); then citing *Gaunt v. Pittaway*, 139 N.C. App. 778, 534 S.E.2d 660 (2000); then citing *Abram v. Charter Med. Corp. of Raleigh, Inc.*, 100 N.C. App. 718, 722-23, 398 S.E.2d 331, 334 (1990); and then citing *Cameron v. New Hanover Mem'l Hosp., Inc.*, 58 N.C. App. 414, 447, 293 S.E.2d 901, 921 (1982)), *disc. rev. denied*, 643 S.E.2d 591 (N.C. 2007). For example, in *Wheeless v. Maria Parham Medical Center, Inc.*, the Court of Appeals determined that the learned profession exemption barred a section 75-1.1 claim by a medical doctor against a hospital and individual physicians in which the plaintiff physician alleged that the defendants had made an anonymous complaint about him to the North Carolina Medical Board. 237 N.C. App. at 585-86, 768 S.E.2d at 121. The court rejected Wheeless's argument that the exemption did not apply "because, by 'illegally access[ing], shar[ing], and us[ing] Plaintiff's peer

review materials and patients' confidential medical records out of malice and for financial gain for illegal improper purpose[,]' " defendants did not render professional services. *Id.* at 589, 768 S.E.2d at 123 (alterations in original). Rather, the court viewed "defendants' alleged conduct in making a complaint to the Medical Board as integral to their role in ensuring the provision of adequate medical care"; accordingly, the learned profession exemption barred plaintiff's action. *Id.* at 591, 768 S.E.2d at 124.

Plaintiffs argue that the exemption should not apply here because, although the individual defendants are all licensed chiropractors, HNS itself is not a member of a learned profession and, in any event, HNS's role as an intermediary between providers and insurers is a business activity that cannot be properly described as "render[ing]" professional services.

Plaintiffs point us to the recently decided case of *Hamlet H.M.A., LLC v. Hernandez*, ___ N.C. App. ___, 821 S.E.2d 600 (2018), *disc. rev. denied*, ___ N.C. ___, 822 S.E.2d 637 (2019), *and disc. rev. denied*, ___ N.C. ___, 822 S.E.2d 640 (2019), in support of their argument that the activities alleged in this case do not fall within the ambit of "professional services rendered." In *Hamlet* the Court of Appeals considered whether a physician's UDTP counterclaim rooted in a dispute over an employment contract was barred by the learned profession exemption. *Id.* at ___, 821 S.E.2d at 602-03. The Court of Appeals concluded that the learned profession exemption did not bar the claim, reasoning that "cases addressing UDTP claims in a medical context

do not suggest that negotiations regarding a business arrangement, even between a physician and a hospital, are '*professional services rendered* by a member of a learned profession'" under N.C.G.S. § 75-1.1(a). *Id.* at ___, 821 S.E.2d at 608. The Court of Appeals further concluded: "If we were to interpret the learned profession exception as broadly as plaintiffs suggest we should, any business arrangement between medical professionals would be exempted from UDTP claims. The learned profession exception does not cover claims simply because the participants in the contract are medical professionals." *Id.* at ___, 821 S.E.2d at 608.

While we agree that the mere status of a defendant as a member of a "learned profession" does not shield that defendant from any claim under N.C.G.S. § 75-1.1 regardless of how far removed the claim is from that defendant's professional practice, we conclude that the conduct alleged here does fall within the exemption. All individual defendants, as well as all members of HNS, are licensed chiropractors, thus meeting the exemption's first prong. We also agree with defendants and the court below that the activity alleged in the second amended complaint constitutes rendering of professional services under the statute.

The alleged conduct that is at the heart of this action is directly related to providing patient care. Plaintiffs argue that HNS is engaged both in violations of our state's antitrust laws and in conduct forbidden under our Insurance Law, in that HNS terminates providers' in-network access to patients when those providers exceed a certain average cost per patient. Thus, plaintiffs contend, in order to retain in-

network status with the insurance payors with whom HNS contracts, chiropractic providers must limit their average cost of services per patient and, thus, the number of treatments provided to their patients. If a particular chiropractor renders services to patients who require, on average, more extensive chiropractic care than the patients of other providers who contract with HNS, that provider risks exceeding HNS's allowable average cost and losing access to patients served via the networks of the various payors.

In addition, plaintiffs allege that—through the operation of HNS's monopsony—chiropractic services are being reduced, meaning that North Carolinians who were previously receiving care from providers in HNS's network have either ceased receiving this care or have received fewer services due to HNS's enforcement of its average cost cap on providers. Since the basis for plaintiffs' UDTP claim is that chiropractors are reducing the level of services patients receive, we conclude that the conduct alleged in the second amended complaint is sufficiently related to patient care to fall within the rendering of professional services, as that term has been previously interpreted by the courts of this state. Thus, we affirm the Business Court's dismissal of plaintiffs' unfair trade practice claims under N.C.G.S. § 75-1.1.

IV.   Declaratory Judgment

In their second amended complaint, plaintiffs also sought relief under the Declaratory Judgment Act as follows:

a.      HNS is an unlicensed medical service corporation without the authority to enter into an agreement to provide chiropractic services to the Insurers;

b.      HNS is an unlicensed medical service corporation without the authority to enter into participation agreements with Providers;

c.      HNS is not licensed or authorized to provide utilization review of chiropractors including the Providers;

d.      The purported agreements between HNS and Providers are illegal and unenforceable;

e.      The purported agreements between HNS and Providers are an illegal restraint of trade and anti-competitive;

f.      The purported agreements between HNS and the Insurers are illegal and unenforceable;

g.      The purported agreements between HNS and the Insurers are an illegal restraint of trade and anti-competitive;

h.      The exclusivity provisions of the contracts and the exclusivity practices between HNS and the Insurers are illegal, anti-competitive unreasonable restraints of trade, unfair trade practices, and unenforceable;

i.      HNS's Utilization Review Process is an illegal unfair trade practice;

and

j.      Defendants have restrained trade, committed unfair trade practices, and monopsonized the market for chiropractic services in violation of N.C. Gen. Stat. §§ 75-2 and 75-2.1.

As demonstrated above, much of the declaratory relief plaintiffs seek comes in the form of legal conclusions that we have already addressed in our earlier discussion of plaintiffs' antitrust claims and their claim that defendants have engaged in unfair trade practices under N.C.G.S. § 75-1.1. Thus, we also affirm the Business Court's denial of declaratory relief to the extent that claim relates to plaintiffs' Chapter 75 claims.

Several of the declarations sought by plaintiffs, however, relate to their claims that defendants fail to comply with various provisions of the state's Insurance Law found in Chapter 58 of the North Carolina General Statutes. The Business Court ruled that Chapter 58 does not provide plaintiffs a private cause of action, meaning that their claims for declaratory relief under Chapter 58 must be dismissed. We agree.

As discussed by the Business Court, a statute may authorize a private right of action either explicitly or implicitly, *see Lea v. Grier*, 156 N.C. App. 503, 508-09, 577 S.E.2d 411, 415-16 (2003), though typically, "a statute allows for a private cause of action only where the legislature has expressly provided a private cause of action within the statute," *Time Warner Entm't Advance/Newhouse P'ship v. Town of Landis*, 228 N.C. App. 510, 516, 747 S.E.2d 610, 615 (2013) (quoting *Vanasek v. Duke Power Co.*, 132 N.C. App. 335, 338 n.2, 511 S.E.2d 41, 44 n.2, *cert. denied*, 350 N.C. 851, 539 S.E.2d 13 (1999).

Chapter 58 does not explicitly provide a private cause of action and, as noted by the Business Court, several decisions in recent years from both our Court of Appeals and our state's federal district courts have determined that no private cause of action exists under other portions of Chapter 58. *See, e.g.*, *Cobb v. Pa. Life Ins. Co.*, 215 N.C. App. 268, 281, 715 S.E.2d 541, 552 (2011) (finding no private cause of action under N.C.G.S. § 58-3-115); *Defeat the Beat, Inc. v. Underwriters at Lloyd's London*, 194 N.C. App. 108, 117-18, 669 S.E.2d 48, 54 (2008) (stating that no private right of action exists under N.C.G.S. § 58-21-45(a)). Rather, courts have previously concluded that alleged violations of this Chapter may only be remedied through action by the Commissioner of Insurance. Thus, the Business Court concluded that there was "no legislative implication that sections 58-50-61, 58-65-1, and 58-65-50 allow for enforcement by a private party."

Plaintiffs seek declarations that HNS is required to be licensed as a medical service corporation under N.C.G.S. § 58-65-50 or as a utilization review organization defined by N.C.G.S. § 58-50-61(a)(18). Section 58-65-50 states that "[n]o corporation subject to the provisions of this Article and Article 66 of this Chapter shall issue contracts for the rendering of hospital or medical and/or dental service to subscribers, until the Commissioner of Insurance has, by formal certificate or license, authorized it to do so" and then describes the materials to be provided to the Commissioner as part of the licensure application. N.C.G.S. § 58-65-50 (2017).

Section 58-50-61 governs the procedures for utilization review, defined as "a set of formal techniques designed to monitor the use of or evaluate the clinical necessity, appropriateness, efficacy or efficiency of health care services, procedures, providers, or facilities." *Id.* § 58-50-61(a)(17) (2017). A "utilization review organization" is "an entity that conducts utilization review under a managed care plan, but does not mean an insurer performing utilization review for its own health benefit plan." *Id.* § 58-50-61(a)(18). According to N.C.G.S. § 58-50-61(o), a violation of the utilization review provisions is subject to the penalties set out in N.C.G.S. § 58-2-70. Section 58-2-70, in turn, provides that "[w]henever the Commissioner has reason to believe that any person has violated any of the provisions of this Chapter, . . . the Commissioner may, after notice and opportunity for a hearing, proceed under the appropriate subsections of this section." *Id.* § 58-2-70(b) (2017).

Plaintiffs argue that our state's Declaratory Judgment Act gives them a path to declaratory relief, notwithstanding Chapter 58's language vesting enforcement authority in the Commissioner of Insurance. In addition, plaintiffs argue that the Business Court erred in ignoring a line of cases declining to enforce contracts entered into by unlicensed professionals. For example, plaintiffs point us to *Bryan Builders Supply v. Midyette*, 274 N.C. 264, 162 S.E.2d 507 (1968) (recognizing that state law bars an unlicensed contractor from maintaining a breach of contract action against the owner of a building valued at more than the minimum sum specified in the licensing statutes governing general contractors) and *Gower v. Strout Realty, Inc.*, 56

N.C. App. 603, 289 S.E.2d 880 (1982) (recognizing that our courts have held contracts by unlicensed real estate brokers to be invalid).

We conclude that the language of the statutory provisions, as well as the previous cases interpreting other portions of Chapter 58, vest enforcement of the requirements of the statutory sections identified by plaintiffs in the Commissioner of Insurance, meaning that plaintiffs do not have a private right of action for declaratory relief under these provisions. We also agree with the Business Court that the cases cited by plaintiffs are distinguishable in that "[t]hose cases did not seek to substitute a court's judgment for that of a regulatory agency to which the legislature has entrusted enforcement." Thus, we conclude that the Business Court properly denied all of plaintiffs' claims for declaratory relief.

V.     Breach of Fiduciary Duty

Finally, plaintiffs contend that defendants breached a fiduciary duty that they owed to plaintiffs and all members of the putative class.[4] To establish a claim for breach of fiduciary duty, a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff. *Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013). Thus, to make out a claim

---

[4] This claim necessarily applies only to those plaintiffs who participated at one time in the HNS network.

for breach of a fiduciary duty, plaintiffs must first allege facts that, taken as true, demonstrate that a fiduciary relationship existed between the parties. A fiduciary relationship "has been broadly defined by this Court as one in which 'there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.' " *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001) (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)). "The very nature of some relationships, such as the one between a trustee and the trust beneficiary, gives rise to a fiduciary relationship as a matter of law. The list of relationships that we have held to be fiduciary in their very nature is a limited one, and we do not add to it lightly." *CommScope Credit Union*, 369 N.C. at 52, 790 S.E.2d at 660 (first citing *Wachovia Bank & Tr. Co. v. Johnston*, 269 N.C. 701, 711, 153 S.E.2d 449, 457 (1967); then citing *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367, 760 S.E.2d 263, 266 (2014)). Our courts have been clear that general contractual relationships do not typically rise to the level of fiduciary relationships. "[P]arties to a contract do not thereby become each other's fiduciaries; they generally owe no special duty to one another beyond the terms of the contract . . . ." *Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 61, 418 S.E.2d 694, 699 (citations omitted), *disc. rev. denied*, 332 N.C. 482, 421 S.E.2d 350 (1992).

Plaintiffs allege that they have a fiduciary relationship with defendants because they entered into a joint venture with HNS. In the alternative, plaintiffs

argued before the Business Court and this Court that a fiduciary relationship was created under agency law, in that HNS purported to act as plaintiffs' agent in negotiations with the insurance payors. We agree with the Business Court that plaintiffs' allegation of a fiduciary duty—and, therefore, their claim of a breach of that duty—fails as a matter of law.

We begin by addressing plaintiffs' alternative argument: that agency principles dictate that HNS was acting as an agent for plaintiffs as a matter of law when negotiating the terms governing in-network providers' relationship with the medical payors. As discussed above, typical contractual relationships do not give rise to the special status of a fiduciary relationship. We believe that plaintiffs' agency argument ignores this principle and seeks to establish a fiduciary relationship arising out of the operation of a general business relationship.

Next we address plaintiffs' argument that they are in a fiduciary relationship with HNS by virtue of a joint venture. As the Business Court pointed out, plaintiffs cannot show that they are in a joint venture with defendants for two reasons. First, "[a] joint venture exists when there is: '(1) an agreement, express or implied, to carry out a single business venture *with joint sharing of profits*, and (2) an *equal right of control* of the means employed to carry out the venture.'" *Rifenburg Constr., Inc. v. Brier Creek Assocs. Ltd. P'ship*, 160 N.C. App. 626, 632, 586 S.E.2d 812, 817 (2003), *aff'd per curiam*, 358 N.C. 218, 593 S.E.2d 585 (2004) (quoting *Rhoney v. Fele*, 134 N.C. App. 614, 620, 518 S.E.2d 536, 541 (1999), *disc. rev. denied*, 351 N.C. 360, 542

S.E.2d 217 (2000)). Plaintiffs' own allegations of lack of control and unequal sharing of profits and losses defeat this argument. Second, as the Business Court points out, plaintiffs' own agreements with HNS specifically disclaim any joint venture between the parties, stating that "[n]o work, act, commission, or omission of either party pursuant to the terms and conditions of this Agreement shall make or render HNS or Participant an agent, servant, or employee of, *or joint venture* with the other." (Emphasis added.) Thus, on the face of their contracts with HNS, plaintiffs agreed that no joint venture was formed via the parties' contractual relationship.

Plaintiffs seek to avoid the plain language of their agreements with HNS through their broader argument that these contracts are illegal because HNS has not complied with the licensure requirements of Chapter 58 and thus had no authority to enter into the agreements at issue here. Because we have concluded that the licensure provisions of Chapter 58 fall squarely within the purview of the Commissioner of Insurance and that, therefore, the General Statutes do not provide plaintiffs a private right of action to seek a declaratory judgment that their agreements with HNS are void, we have already rejected plaintiffs' collateral challenge to the contracts. Thus, based on the joint venture elements that are not met here as well as the language of the contracts, we are persuaded that plaintiffs have no joint venture with defendants. Because plaintiffs' contractual relationship with HNS is insufficient to establish a fiduciary relationship as a matter of law, we affirm the Business Court's dismissal of plaintiffs' breach of fiduciary duty claim.

Conclusion

Because we affirm the Business Court's rulings dismissing each of plaintiffs' substantive claims alleged in their second amended complaint, as well as all derivative claims, we affirm the Business Court's orders dismissing plaintiffs' entire action. As noted above, the members of the Court being equally divided on plaintiffs' antitrust claims, including the derivative claim of civil conspiracy, the Business Court's dismissal of these claims stands without precedential value.

AFFIRMED.

Justice DAVIS did not participate in the consideration or decision of this case.

Justice EARLS concurring in part and dissenting in part.

I dissent from the holding of Section III of the majority opinion concerning the extent to which plaintiffs' allegations of unfair and deceptive trade practices that are not based on the same allegations as their antitrust claims are barred by the "learned profession" exclusion of N.C.G.S. § 75-1.1(a). In all other respects I concur with the remainder of the opinion. This Court has not previously interpreted the scope of the statutory learned profession exception to the general prohibition on unfair methods of competition and unfair and deceptive trade practices. In my view, the specific allegations of the complaint relating to that claim in this case do not properly fall within the scope of that exception because the alleged unfair and deceptive conduct in question was not the rendering of professional services, namely chiropractic services, to patients. Therefore, I would reverse the 18 August 2017 ruling of the business court, *Sykes v. Health Network Solutions, Inc.*, No. 13 CVS 2595, 2017 WL 3601347 (N.C. Super. Ct. Forsyth County (Bus. Ct.) Aug. 18, 2017) (*Sykes I*), with regard to claims under the unfair and deceptive trade practices act, N.C.G.S. § 75-1.1 (UDTP) that are based on allegations separate and distinct from the antitrust claims, and remand for further proceedings on those claims.

Most of the allegations in this case relate to plaintiffs' claims that defendant Health Network Solutions, Inc. (HNS) operates an intermediary network for chiropractic services that functions as a monopsony, a buyer-side form of restraint of trade to control competition, supply, and the pricing of chiropractic services in North

Carolina. Indeed, almost all of the trial court's first order, which is the order dismissing the UDTP claims, actually addresses the antitrust claims. There has been scant attention to the UDTP allegations that are separate and apart from the antitrust claims.

The UDTP claim for relief in plaintiffs' second amended complaint alleges thirteen grounds, of which seven relate to antitrust violations and anticompetitive conduct.[1] Of the remaining six, one is a conclusory characterization that does not specify any particular behavior.[2] The five allegations based on distinct conduct not encompassed by the antitrust claims are that "Defendants' actions and conduct that constitute unfair and deceptive trade practices include, but are not limited to:"

> d. implementing a utilization review procedure without being authorized or licensed to do so;
>
> e. failing to follow statutory requirements for utilization review;
>
> . . . .
>
> g. organizing a medical service corporation without being licensed to do so;
>
> . . . .
>
> i. failing to disclose their conflicts of interest;

---

[1] The antitrust and anticompetitive conduct are alleged in subparagraphs a-c, f, h, k. & *l* of paragraph 162 of the Second Amended Class Action Complaint filed on 20 July 2015.

[2] Paragraph 162(m) alleges that defendants have violated the UDTP by "acting unfairly and oppressively toward Plaintiff and the Class in their dealings with them in an abuse of power and position to achieve ends and using means contrary to the public policy of this State."

> j.     misrepresenting their services and the benefits provided to Providers participating in the HNS Network[.]

Plaintiffs make additional allegations relevant to this claim, including that defendants were engaged in commerce and that these unfair and deceptive practices have caused plaintiffs damages in excess of $10,000. Thus, on a motion to dismiss under Rule 12(b)(6), reviewed de novo by this Court, the question is whether, if true, the allegations state a claim for relief under some legal theory. *Corwin ex rel. Corwin Tr. v. British Am. Tobacco PLC*, ___ N.C. ___, ___, 821 S.E.2d 729, 736 (2018) (citing *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51, 790 S.E.2d 657, 659 (2016)).

The General Assembly enacted N.C.G.S. § 75-1.1 almost exactly fifty years ago, stating that:

> The purpose of this Section is to declare, and to provide civil legal means to maintain, ethical standards of dealings between persons engaged in business, and between persons engaged in business and the consuming public within this State, to the end that good faith and fair dealings between buyers and sellers at all levels of commerce be had in this State.

Act of June 12, 1969, ch. 833, sec. 1(b), 1969 N.C. Sess. Laws 930, 930. In 1977 the statute was "amended . . . to define 'commerce' inclusively as 'business activit[ies], *however denominated,*'" *Bhatti v. Buckland*, 328 N.C. 240, 245, 400 S.E.2d 440, 443 (1991), subject to the express limitation for "professional services rendered by a

member of a learned profession," Act of June 27, 1977, ch. 747, sec. 2, 1977 N.C. Sess. Laws 984, 984. As this Court explained in *Bhatti*, consistent with the purpose of the law to protect the consuming public and the generally broad definition of the term "business," the statute is intended to have an inclusive scope, 328 N.C. at 245-46, 400 S.E.2d at 443-44, and the 1977 amendments in particular were "intended to expand the potential liability for certain proscribed acts," *United Roasters, Inc. v. Colgate-Palmolive Co.*, 485 F. Supp. 1049, 1057 (E.D.N.C. 1980), *aff'd*, 649 F.2d 985 (4th Cir.), *cert. denied*, 454 U.S. 1054 (1981).

The statute is not limited to cases involving consumers only. "After all, unfair trade practices involving only businesses affect the consumer as well." *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 665, 370 S.E.2d 375, 389 (1988). The Court has previously explained that " '[b]usiness activities' is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 594, 403 S.E.2d 483, 493 (1991). Moreover, " '[c]ommerce' in its broadest sense comprehends intercourse for the purposes of trade in any form." *Sara Lee Corp. v. Carter*, 351 N.C. 27, 32, 519 S.E.2d 308, 311 (1999) (quoting *Johnson v. Phoenix Mut. Life Ins. Co.*, 300 N.C. 247, 261, 266 S.E.2d 610, 620 (1980)).

Our courts have employed a three-prong test to establish a prima facie case under this statute. *Spartan Leasing Inc. of N.C. v. Pollard*, 101 N.C. App. 450, 400

S.E.2d 476 (1991). A plaintiff must show "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff." *Id.* at 460-61, 400 S.E.2d at 482 (citing *Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397 (1981)); *see also First Atl. Mgmt. Corp. v. Dunlea Realty Co.*, 131 N.C. App. 242, 252, 507 S.E.2d 56, 63 (1998) (same). Unfair competition has been described generally as conduct "which a court of equity would consider unfair." *Pinehurst, Inc. v. O'Leary Bros. Realty, Inc.*, 79 N.C. App. 51, 59, 338 S.E.2d 918, 923 (citing William B. Aycock, *North Carolina Law on Antitrust and Consumer Protection*, 60 N.C. L. Rev. 207, 217 (1982)), *disc. rev. denied*, 316 N.C. 378, 342 S.E.2d 896 (1986). "[A] practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Barbee v. Atl. Marine Sales & Serv.*, 115 N.C. App. 641, 646, 446 S.E.2d 117, 121 (quoting *Marshall*, 302 N.C. at 548, 276 S.E.2d at 403), *disc. rev. denied*, 337 N.C. 689, 448 S.E.2d 516 (1994). "[A]ll the facts and circumstances surrounding the transaction" are relevant to determining "[w]hether an act or practice is unfair or deceptive." *Id.* at 646, 436 S.E.2d at 121 (citing *Marshall*, 302 N.C. at 548, 276 S.E.2d at 403). Bad faith or deliberate acts of deceit do not need to be shown. *Boyd v. Drum*, 129 N.C. App. 586, 593, 501 S.E.2d 91, 97 (1998) (citing *Forsyth Mem'l Hosp., Inc. v. Contreras*, 107 N.C. App. 611, 614, 421 S.E.2d 167, 169-70 (1992), *disc. rev. denied*, 333 N.C. 344, 426 S.E.2d 705 (1993)), *aff'd per curiam*, 350 N.C. 90, 511 S.E.2d 304 (1999).

In this case, plaintiffs' allegations, as summarized in subparagraphs d, e, g, i, and j of the claim for relief (hereinafter "the non-antitrust conduct") if true, establish all three elements of a prima facie case of unfair and deceptive trade practices affecting commerce that have injured plaintiffs. The only argument made by defendants on the motion to dismiss, and the only ground found by the trial court, was that none of these allegations can support a claim for relief because chiropractors are learned professionals and "[t]he impact of the Plaintiffs' claim is to fundamentally change the marketplace in which chiropractors deliver their services and the way in which insurance companies contract for the delivery of those services." Thus, the only question before this Court is whether defendants' actions as alleged, summarized in those five counts of the claim for relief and as more fully described throughout the second amended complaint, are subject to the exception for "professional services rendered by a member of a learned profession." N.C.G.S. § 75-1.1(b) (2017).

I agree with the majority that our Court of Appeals has followed, and we do well to adopt, a two-part inquiry to determine whether the "learned profession" exclusion applies: "[F]irst, the person or entity performing the alleged act must be a member of a learned profession. Second, the conduct in question must be a rendering of professional services." *Wheeless v. Maria Parham Med. Ctr., Inc.*, 237 N.C. App. 584, 589, 768 S.E.2d 119, 123 (2014) (quoting *Reid v. Ayers*, 138 N.C. App. 261, 266, 531 S.E.2d 231, 235 (2000) (citation omitted)). I also agree that the first prong is met here even though HNS is itself an association of chiropractors acting as an

intermediary between providers and insurers. What seems clear to me is that the non-antitrust conduct alleged in the complaint does not involve providing professional services. Therefore, the second prong of the test is not met here.

The Court of Appeals cases addressing this question have held that when a doctor or lawyer or other member of a learned profession is engaging in business negotiations or contractual arrangements, advertising his or her practice, or buying real estate, even though those activities "affect" the provision of professional services, they are not themselves *professional services* entitled to an exemption. *See Hamlet H.M.A., LLC v. Hernandez*, ___ N.C. App. ___, ___ 821 S.E.2d 600, 608 (2018) ("This case involves a business deal, not rendition of professional medical services."), *disc. rev. denied*, ___ N.C. ___, 822 S.E.2d 637, *and disc. rev. denied*, ___ N.C. ___, 822 S.E.2d 640 (2019). In *Reid v. Ayers*, for example, while the conduct at issue involved the provision of professional services by an attorney, the Court of Appeals explained that:

> [N]ot all services performed by attorneys will fall within the exemption. Advertising is not an essential component to the rendering of legal services and thus would fall outside the exemption. *See* 47 N.C. Op. Att'y Gen. 118, 120 (1977) ("Advertising by an attorney is a practice apart from his actual performance of professional services. Indeed, it is not a professional practice at all, but rather a commercial one."). Likewise, the exemption would not encompass attorney price-fixing. *Id.* Although no bright line exists, we think that the exemption applies anytime an attorney or law firm is acting within the scope of the traditional attorney-client role. It would not apply when the attorney or law firm is engaged in the entrepreneurial aspects of

> legal practice that are geared more towards their own
> interests, as opposed to the interests of their clients.

138 N.C. App. at 267-68, 531 S.E.2d at 236 (citing *Short v. Demopolis*, 103 Wash. 2d 52, 60-61, 691 P.2d 163, 168 (1984) (en banc)). The dividing line between what is, and what is not, the rendering of professional services should turn on whether learned professional knowledge and judgment that the ordinary person does not possess is required to provide the services at issue. That is what distinguishes cases involving staff privileges at hospitals and complaints to medical boards, as were at issue in *Cameron v. New Hanover Memorial Hospital, Inc.*, 58 N.C. App. 414, 293 S.E.2d 901, *appeal dismissed and disc. rev. denied*, 307 N.C. 127, 297 S.E.2d 399 (1982), and *Wheeless*, respectively, from this case and from *Hamlet H.M.A.* "The rendering of a professional service is limited to the performance of work '[c]onforming to the standards of a profession' and 'commanded or paid for by another.'" *Phillips v. A Triangle Women's Health Clinic, Inc.*, 155 N.C. App. 372, 381, 573 S.E.2d 600, 605 (2002) (citations omitted), *aff'd per curiam in part and disc. rev. improvidently allowed in part*, 357 N.C. 576, 597 S.E.2d 669 (2003). In *Cameron,* the Court of Appeals explained that the actions complained of by the plaintiffs were not commercial activities subject to UDTP coverage because they involved professional judgments about the competency of podiatrists.

> This evidence indicates that defendants were acting
> in large measure pursuant to an "important quality control
> component" in the administration of the hospital. As one
> court described it, the hospital's obligation is "to exact

> professional competence and the ethical spirit of
> Hippocrates as conditions precedent to . . . staff privileges."
> We conclude that the nature of this consideration of whom
> to grant hospital staff privileges is a necessary assurance
> of good health care; certainly, this is the rendering of
> "professional services" which is now excluded from the
> aegis of G.S. 75-1.1.

*Cameron*, 58 N.C. App. at 446-447, 293 S.E.2d at 920-921 (alteration in original) (first quoting Walter Wadlington, Jon R. Waltz, & Roger B. Dworkin, *Cases and Materials on Law and Medicine* 209 (1980); then quoting *Sosa v. Bd. of Managers of Val Verde Mem'l Hosp.*, 437 F.2d 173, 174 (5th Cir. 1971)). Clearly it takes medical knowledge to be able to assess the skills and competency of medical doctors. But, in this case, ironically, it is precisely the lack of professional judgment in HNS's utilization management procedures that has led plaintiffs here to allege that the organization is committing an unfair trade practice. Plaintiffs allege that, instead of using professional judgment to decide what services in-network patients need, HNS is simply using a mathematical formula based on the average costs of all its providers. But more fundamentally, if HNS is indeed failing to identify conflicts of interest in some manner that is deceptive, or misrepresenting its services and benefits to providers, those are matters relating to how it conducts its business dealings. To illustrate this principle, if HNS had a routine practice of repeatedly leasing medical office space without disclosing that the buildings were uninhabitable, the learned professions exception would not apply even though the routine practice might keep them in business, which, in turn, would facilitate insured patients receipt of

chiropractic services. *Cf. Creekside Apts. v. Poteat*, 116 N.C. App. 26, 36-38, 446 S.E.2d 826, 833-34 (failure to maintain dwellings in a safe, fit, and habitable condition while demanding rent is an unfair and deceptive trade practice), *disc. rev. denied*, 338 N.C. 308, 451 S.E.2d 632 (1994). Typically, specialized medical knowledge is not necessary to ascertain that a building is uninhabitable. Similarly, specialized medical knowledge is not necessary to determine whether HNS is implementing a utilization review procedure without being authorized or licensed to do so or is failing to follow statutory requirements for utilization review.

It may be that plaintiffs cannot prove their allegations, but the sufficiency of their evidence is not at issue here. The allegations of the complaint, taken as true, establish a UDTP claim independent of the antitrust allegations. Expanding the learned profession exception to apply here goes further than what the General Assembly intended when it amended the statute in 1977. When chiropractors are treating patients, the learned profession exception should apply. But when they are running a business processing, administering, and negotiating payments by insurance companies to networked chiropractors, they are in commerce like every other business and should be governed accordingly.

Chief Justice BEASLEY joins in this opinion.