Merrell v. Smith, 2022 NCBC 83.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

CARL E. MERRELL; LYLE RANSON;
JEANETTE RANSON; CRAIG S.
MILLER; WANDA EDWARDS
MILLER; and ROBERT J. NASTASE,

Plaintiffs,

v.

JAMES M. SMITH; JENNIFER
SMITH; and CAROLINA BEER &
BEVERAGE GROUP, LLC f/k/a
CAROLINA BEER & BEVERAGE,
LLC,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

19 CVS 21650 [MASTER FILE]
Related Cases:
19 CVS 22027
19 CVS 23665
**Also filed in 21 CVS 15205**

**ORDER AND OPINION ON
PLAINTIFFS' MOTIONS FOR
SUMMARY JUDGMENT**

1. **THIS MATTER** is before the Court on Plaintiffs' Motions for Summary Judgment, pursuant to Rule 56 of the North Carolina Rules of Civil Procedure (the "Rule(s)"), seeking entry of judgment in Plaintiffs' favor as to liability on their claims for breach of fiduciary duty against Defendant James Michael Smith ("Mike Smith"), filed in each of four factually related cases. The Plaintiffs' Motions for Summary Judgment and the corresponding four cases are: *Cochrane, et al. v. Smith, et al.*, (19 CVS 23665) ("*Cochrane*"), (*Cochrane*, ECF No. 154), *Merrell, et al. v. Smith, et al.*, (19 CVS 21650) ("*Merrell*"), (*Merrell*, ECF No. 144), *Strack, et al. v. Smith, et al.,* (19 CVS 22027) ("*Strack*"), (*Strack*, ECF No. 201), and *Short, et al. v. Smith, et al.,* (21 CVS

15205) ("*Short*"), (*Short*, ECF No. 47) (together, the "Motions").[1]  Because the Motions

raise the same legal issues and arguments, the Court considers the Motions together.

2.     For the reasons set forth herein, the Court **DENIES** the Motions.

*Hemmings & Stevens, PLLC, by Aaron C. Hemmings, for Plaintiffs.*

*Bell, Davis & Pitt P.A., by Edward B. Davis, and Parker Poe Adams & Bernstein LLP, by Michael G. Adams, Morgan H. Rogers, Nicholas H. Lee, and Alexandra Davidson, for Defendants Jennifer Smith and James Michael Smith.*

*Alexander Ricks, PLLC, by Alice C. Richey, Benjamin Leighton, and Mary K. Mandeville, and Morgan, Lewis & Bockius, LLP, by Thomas Peter R. Pound and John A. Vassallo, for Defendants MSI Financial Services, Inc. and Metropolitan Life Insurance, Co.*

*F. Lane Williamson, Administrator, for Defendant Estate of Richard C. Siskey.*

Robinson, Judge.

---

[1] The *Merrell*, *Strack*, *Cochrane*, and *Short* matters involve the same core allegation that the Plaintiffs invested in Carolina Beer & Beverage Group, LLC ("CBB") based on the financial advice of the late Richard Siskey.  The Plaintiffs allege that Mike Smith, Jennifer Smith, and Richard Siskey engaged in a fraudulent insider trading scheme, which induced Plaintiffs to transfer their respective ownership interests in CBB to Siskey prior to CBB being sold, thereby causing Plaintiffs to miss out on the substantial profits resulting from the sale.

On 1 April 2020, the Court adopted a consolidated case caption with the *Merrell* action designated as the "Master File" for the four actions.  (*Strack*, ECF No. 49.)  The order did not formally consolidate the *Merrell*, *Strack*, *Cochrane*, and *Short* matters pursuant to Rule 42.  (*See Strack*, ECF No. 49.)  However, the parties agreed in their Case Management Plan, (*Merrell*, ECF No. 25), to coordination of certain discovery matters and motions practice amongst the cases.

The sole plaintiff in *Short* voluntarily dismissed his claims against all defendants in that case without prejudice, leaving the *Merrell*, *Strack*, and *Cochrane* matters as the three remaining.  On 31 December 2020, the Court *sua sponte* amended the 1 April 2020 order removing the *Short* action from the case caption.  (*See, e.g., Strack*, ECF No. 126.)  The plaintiff in the *Short* action later re-filed, but the case caption was not thereafter amended.

## I.     INTRODUCTION

3.     This case arises out of an alleged fraudulent scheme carried out by Richard C. Siskey ("Siskey"), Mike Smith, and Mike Smith's wife, Jennifer Smith ("Jennifer Smith," together with Mike Smith, the "Smiths"). The Court previously recited in detail the factual allegations surrounding this purported scheme in its 22 December 2020 Order and Opinion on Defendant Carolina Beverage Group, LLC's motion to dismiss in *Strack*, *Merrell*, and *Cochrane*.[2] *See, e.g.*, *Merrell v. Smith*, 2020 NCBC LEXIS 150, at *2–14 (N.C. Super. Ct. Dec. 22, 2020).

4.     Plaintiffs are former members of Carolina Beverage Group, LLC f/k/a Carolina Beer and Beverage ("CBB"), a North Carolina limited liability company. This Opinion concerns only Plaintiffs' claims for breach of fiduciary duty against Mike Smith. The main issue raised by the Motions is whether Mike Smith owed Plaintiffs, minority members in CBB, a fiduciary duty due to his majority ownership in CBB.

## II.     FACTUAL BACKGROUND

5.     The Court does not make findings of fact when ruling on motions for summary judgment. "[T]o provide context for its ruling, the Court may state either those facts that it believes are not in material dispute or those facts on which a material dispute forecloses summary adjudication." *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at *6 (N.C. Super. Ct. Sept. 26, 2017); *see also Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142 (1975) (encouraging the

---

[2] Plaintiffs voluntarily dismissed their claims against Defendant Carolina Beverage Group, LLC with prejudice on 22 December 2021. (*Cochrane*, ECF No. 147; *Merrell*, ECF No. 137; *Strack*, ECF No. 192; *Short*, ECF No. 18.)

trial court to articulate a summary of the relevant evidence of record to provide context for the claims and the motion(s)).

A.    **The Parties**

6.    The plaintiffs in the *Merrell* matter are Carl E. Merrell, Lyle Ranson, Jeanette Ranson, Craig S. Miller, Wanda E. Miller, and Robert J. Nastase (together, the "*Merrell* Plaintiffs").[3]  (Second Am. Compl. ¶¶ 6, 8, 10–11, *Merrell*, ECF No. 24.)[4]

7.    The plaintiffs in the *Strack* matter are Jeffrey A. Strack, Penny N. Strack, James C. Wilson, Pamela Boileau, Dallas Pendry, Jr., Mallory Johnson, Rita Dilling, Carolyn Crozier, the Estate of Thomas J. Crozier, Jr.,[5] and Kent Kalina (together, the "*Strack* Plaintiffs").  (Second Am. Compl. ¶¶ 8–17, *Strack*, ECF No. 33.)

---

[3] Plaintiff Robert J. Nastase died on 13 March 2022.  (*Merrell*, ECF No. 167.)  On 21 September 2022, Robert Todd Nastase was duly appointed the executor of Robert J. Nastase's estate in South Carolina.  (*Merrell*, ECF No. 173, Ex. A.)  Robert Todd Nastase, however, has not been substituted for the deceased in this matter, as he has not demonstrated that he qualifies as the personal representative for the Estate of Robert J. Nastase.  (*Merrell*, ECF No. 179, at 2.)

[4] Given the lengthy record in these matters, the Court cites to the Official Record with both the ECF Nos. *and* the Record Exhibit numbers, where feasible, as follows, (ECF Nos. [ ] – [ ], R. Ex. [ ]).  Documents submitted by the parties are always cited with the case name, (*Case Name*, ECF No. [ ], R. Ex. [ ]).  To the extent a document has been filed in more than one of these matters, or multiple documents substantiate the same fact or issue, the Court cites only to one filing in order to keep this Order and Opinion and the citations herein from being unduly lengthy.

[5] Plaintiff Thomas J. Crozier, Jr. died on 13 September 2021.  (*Strack*, ECF No. 243, ¶ 1.)  On 8 December 2021, Carolyn B. Crozier was duly appointed the executor of the decedent's estate.  (*Strack*, ECF No. 243, ¶ 1.)  Pursuant to a motion filed 28 March 2022, (*Strack*, ECF No. 241), the Court ordered that Carolyn B. Crozier, as the Executor of the Estate of Thomas J. Crozier, Jr., be substituted for Thomas J. Crozier, Jr. as Plaintiff, (*Strack*, ECF No. 243, ¶ 3).

8. The plaintiffs in the *Cochrane* matter are Jeff Cochrane and Gary Cochrane, as administrators of the Estate of Ralph N. Cochrane. (Am. Compl. ¶¶ 1, 8, *Cochrane*, ECF No. 7.)

9. The plaintiff in the *Short* matter is Charles Short ("Short"). (Am. Compl. ¶ 8, *Short*, ECF No. 11.)

10. The Court refers to the *Merrell*, *Strack*, *Cochrane*, and *Short* plaintiffs herein as "Plaintiffs" when referencing them jointly.

11. Defendant Mike Smith is the co-founder and former CEO of CBB. (Second Am. Compl. ¶ 18, *Strack*, ECF No. 33.)

12. Defendant Jennifer Smith was an employee of CBB and is married to Mike Smith.[6] (Second Am. Compl. ¶ 19, *Strack*, ECF No. 33.)

## B. Relevant Events Leading up to the Plaintiffs' CBB Unit Sales in 2007 and 2008

13. CBB filed its Articles of Organization with the North Carolina Secretary of State on 24 September 1997. (Articles of Organization, *Merrell*, ECF 138.36, R. Ex. 9.) CBB was organized by Mike Smith and John Stritch, CBB's co-founder and President, as a manager-managed LLC. (*Merrell*, ECF 138.36, R. Ex. 9.)

14. Section 4.1 of the CBB 2000 Operating Agreement provided that Mike Smith and John T. Stritch would be the managers of CBB. (Am. Restated Operating Agreement of CBB 5, *Merrell*, ECF 138.57, R. Ex. 70 ["2000 Operating Agreement"].) Section 4.2 provided that the managers "shall manage and control the business and affairs of the Company to the best of their ability and shall use their best efforts to

---

[6] Jennifer Smith is not a party to these Motions.

carry out the purposes of the Company as set forth herein." (2000 Operating Agreement 5.) Section 9.9 required the "unanimous consent of all of the Members" to amend the Operating Agreement. (2000 Operating Agreement 23.)

15. The undisputed evidence shows that in 2000, Mike Smith asked Siskey to help him raise start-up capital for CBB. (Dep. James Michael Smith 94:12–95:3, 96:17–100:17, *Merrell*, ECF No. 138.2, R. Ex. Smith-1 ["M. Smith Dep."].) Further, the undisputed evidence shows that Mike Smith and Siskey agreed that Siskey would circulate a private placement memorandum to raise equity investments in CBB in order to identify and introduce potential investors to Mike Smith and John Stritch. (*See* M. Smith Dep. 94:20–95:1, 107:3–112:10; CBB Private Placement Memo 20, *Merrell*, ECF No. 138.56, R. Ex. 67 ["CBB PPM"].)

16. The CBB Private Placement Memorandum ("PPM") provided that CBB had the right to issue up to 100 units and that one CBB unit was equal to a one percent (1%) membership interest in the company. (CBB PPM 21.) Through the PPM, CBB offered to sell a minimum of 15 units and a maximum of 27.5 units to investors, or between 15% and 27.5% of the company. (CBB PPM, App. VI, 2.)

17. Plaintiffs are former members of CBB who purchased their units in the company between 23 January 2001 and 22 September 2003. (*Merrell*, ECF No. 138.32, R. Ex. Smith-31.) In 2001, the purchase price for one unit of CBB was $100,000 and a half (.5) unit was $50,000. (*Merrell*, ECF No. 138.32, R. Ex. Smith-31.) The price to purchase units changed in subsequent years. (*See, e.g., Merrell*, ECF No. 138.32, R. Ex. Smith-31) (chart containing information regarding Plaintiffs'

unit purchases, distributions, and unit sales, showing, for example, that Kent Kalina purchased a half (.5) unit in 2003 for $54,500).

18. Siskey became a member of CBB on 15 September 2000. (*Merrell*, ECF No. 156.26, R. Ex. 15.) Siskey originally purchased five units of CBB, (M. Smith. Dep. 97:11–97:19; *Merrell*, ECF No. 156.26, R. Ex. 15), but thereafter sold his units over time. On 16 December 2003, Siskey sold the last of the units he then owned (.25 units) to Plaintiff Roy Lynam. (*Strack*, ECF No. 191.267, R. Ex. 823.)

19. On 11 December 2006, Mike Smith emailed Siskey stating that he was "being approached by an investment group seeking to purchase [CBB]." He further advised Siskey: "I'll keep you posted . . . I'm certainly not in a rush as the best is yet to come for [CBB]. Word on the street is we have the Cap Can deal. This franchise is worth about 6-7 million net profit annually."[7] (*Merrell*, ECF No. 138.39, R. Ex. 24 ["2006 Email"].)

20. Three months after providing Siskey with this information, on 12 March 2007, Mike Smith and John Stritch sent a letter to members informing them of the upcoming annual meeting to be held on 29 March 2007.[8] (*Merrell*, ECF No. 138.61, R. Ex. 94 ["Mar. 2007 Letter"].) The letter contained updates regarding CBB's

---

[7] The CapCan line was part of an agreement between CBB and Rexam for CBB to install and put into production a new bottling line. (*See* M. Smith Aff. ¶ 109, *Merrell*, ECF No. 139, R. Ex. 1.) The contract with Rexam was signed by Mike Smith on 28 March 2007. (M. Smith Aff. ¶ 33(o), *Merrell*, ECF No. 139, R. Ex. 1.)

[8] The undisputed evidence shows that an email was sent on 2 March 2007 by Jennifer Smith to the "Partner[s]" of CBB informing them of the 29 March 2007 "annual business meeting." (*Strack*, ECF No. 191.77, R. Ex. 93.) The email stated that a "formal letter and invitation to the meeting from CEO, [Mike] Smith and President, John Stritch will be coming to you via mail." (*Strack*, ECF No. 191.77, R. Ex. 93.)

financial performance and noted a sales increase of 400% from $5.6 million in 2005 to $24 million in 2007 due to a new can line which was being utilized to 100% capacity.[9] (Mar. 2007 Letter 1–2; Aff. Mike Smith ¶ 33(k), *Merrell*, ECF No. 139, R. Ex. 1 ["M. Smith Aff."] (describing the 2005 company sales).) The letter further informed members that an additional bottling line would be installed in November 2007, which would lead to a separate revenue stream for the company. (Mar. 2007 Letter 2.)

21. On 1 October 2007, Mike Smith and John Stritch sent a letter to members (the "October 1 Letter") providing a report on CBB's mid-year performance, an update on building expansions, and an evaluation of next steps for the business. (*Merrell*, ECF No. 138.64, R. Ex. 104 ["Oct. 1 Letter"].) In relevant part, the letter informed members that net income for the first half of 2007 was $5 million as compared to just over $2 million for the same period in 2006. (Oct. 1 Letter 1.) The letter estimated that net income for 2007 would exceed $7 million but that "further distribution of earnings is speculative at best[.]" (Oct. 1 Letter 1.) The letter also informed members

---

[9] In 2001, CBB owned breweries in Boone, North Carolina and in Mooresville, North Carolina, and performed, among other things, packaging and production of bottled products. (*Merrell*, ECF No. 138.165, R. Ex. 607.) By early 2002, CBB had purchased brand equity in other beer lines to expand its existing portfolio of beers. (*Merrell*, ECF No. 138.166, R. Ex. 608.) It had expanded its effort to attract contract packaging work, such as can and bottling lines, which would offer increased revenues, and ultimately, CBB contracted with Mark Anthony Brands, which owned Mikes Hard Lemonade, Mission Hill Winery, and Beringer Winery. (*Merrell,* ECF No. 138.166, R. Ex. 608.) Under that agreement, Mark Anthony Brands sent 95% of all liquid, flavoring, and packaging to CBB to produce and package the final product. (*Merrell*, ECF No. 138.166, R. Ex. 608.) By late 2002, these packaging projects were the prime revenue generating vehicle for CBB. (*Merrell*, ECF No. 138.168, R. Ex. 610.) The same remained true in later years, and by 2006, the canning and bottling lines were showing the greatest growth with the addition of can production lines as the company's plan for future growth. (*Merrell*, ECF No. 138.128, R. Ex. 292.)

that CBB was expanding its plant at a cost of $4.2 million and investing in new equipment at a price of $6.5 million, $4 million of which was financed by the packaging supplier. (Oct. 1 Letter 2.) Finally, the letter stated that CBB would "begin due diligence regarding a potential sale of the company" within the "next twelve months" but that "[a]ny potential sale of the company at this point is truly speculative." (Oct. 1 Letter 3.)

22. In or around October 2007, Mike Smith made CBB's corporate counsel, Wishart, Norris, Henninger & Pittman P.A. ("Wishart Norris"), aware that Siskey had knowledge of the possible sale of the company and was in the process of purchasing membership interests in CBB from investors who lacked this information.

23. On 3 October 2007, Wishart Norris hand-delivered a letter to Siskey (the "October 3 Letter") warning him that it is unlawful "to omit . . . a material fact in connection with the purchase or sale of any security. . . ." (*Merrell*, ECF No. 138.38, R. Ex. 23 ["Oct. 3 Letter"].) The letter warned Siskey that if he had knowledge regarding CBB and "its future plans, including plans to sell[,]" then he must share that knowledge with the members of CBB whose units Siskey intended to buy. (Oct. 3 Letter 1.) Further, the letter stated that Mike Smith would withhold his consent from transfers of any interests in CBB until "all members of the company" were made aware of management's plans. (Oct. 3 Letter 2.) The letter stated that the firm and Mike Smith "believe this action is prudent given the possible liability that may be incurred . . . if any more sales of interests occur without all parties having knowledge of all the relevant information." (Oct. 3 Letter 2.)

24. Following the October 1 and 3 Letters, CBB did not authorize any agreements to sell units in CBB until 15 October 2007. (*See Strack*, ECF Nos. 191.131, R. Ex. 266, 191.247, R. Ex. 696; *Merrell*, ECF No. 138.55, R. Ex. 66.)

25. Plaintiffs thereafter sold their CBB units to Siskey between 15 October 2007 and 27 March 2008. (*See, e.g., Strack*, ECF Nos. 191.131, R. Ex. 266, 191.247, R. Ex. 696, 191.224, R. Ex. 531; *Merrell*, ECF No. 138.55, R. Ex. 66.)

## C. The Amendment to the CBB Operating Agreement and the Effect on Plaintiffs' Unit Sales

26. All Plaintiffs sold their units to Siskey using the "Consent" method, pursuant to Sections 7.1(c)(i) and 7.1(e) of the 2003 CBB Operating Agreement.[10] (2000 Op. Agreement 16–18.) Under this method, a member could transfer units to an individual, so long as the member obtained the "prior written consent of Members holding at least sixty five percent (65%) of the Percentage Interests held by all Members." (2000 Op. Agreement § 7.1(c)(i); *see also Cochrane*, ECF No. 166.29, R. Ex. 542.)

27. Members selling their interests pursuant to the Consent method were required to sign Assignment and Purchase Agreements ("APA(s)"), which demonstrated their assent to the transaction and named who was purchasing the units, while the members giving approval for such transfers signed Consent to

---

[10] The 2000 Operating Agreement was amended in 2003. (*See Merrell*, ECF No. 139.3, R. Ex. Mike-2.) The only change relevant to the Motions was to change the unit sale permission requirement from unanimous written member approval to only 65% written member approval. (*See Merrell*, ECF No. 139.3, R. Ex. Mike-2.) Therefore, the Court cites herein to the 2000 Operating Agreement or 2007 Operating Agreement, unless otherwise referencing the changed language from the 2003 amendment.

Transfer of Membership Interest documents ("Consent Agreement(s)"). (*See, e.g., Strack*, ECF No. 191.229, R. Ex. 600.) Members using the Consent method to sell their units were required to have both documents executed to transfer their interest to the purchaser.

28. On 26 October 2007, CBB amended its Operating Agreement ("2007 Operating Agreement"). (Am. Restated Operating Agreement of CBB, *Merrell*, ECF No. 138.71, R. Ex. 116 ["2007 Am. Op. Agreement"].) A letter sent by CBB on 27 October 2007 informed CBB's members of changes to the Operating Agreement. (*Merrell*, ECF No. 138.70, R. Ex. 115 ["Oct. 27 Letter"].) Three categories were modified: (1) provisions relating to tax compliance; (2) provisions to allow for tax distributions to an owner of record during the tax year; and (3) a provision to allow majority rather than unanimous member approval to amend the Operating Agreement. (Oct. 27 Letter.)

29. The amendments did not change the *methods* of sale of CBB units. (*See generally* 2007 Am. Op. Agreement.) However, rather than the prior 65% written approval requirement to use the Consent method, the amendments permitted the method's use if only 51% of the "voting ownership interests" approved. (2007 Am. Op. Agreement 14, § 7.1(c)(i).)

30. Mike Smith and John Stritch signed their approval to the amendments on 26 October 2007. (2007 Am. Op. Agreement 30.) Unanimous member approval was not obtained until 14 December 2007. (Written Consent 2, *Merrell*, ECF No. 138.97, R. Ex. 243; All Written Consents, *Merrell*, ECF No. 138.104, R. Ex. 256.)

31.     Eleven plaintiffs sold their CBB units to Siskey prior to the effective date of the amendments: James Wilson, Carl Merrell, Pamela Boileau, Jeffrey and Penny Strack, Kent Kalina, Carolyn Crozier, the Estate of Thomas J. Crozier, Jr., Jeff Cochrane and Gary Cochrane, as administrators of the Estate of Ralph N. Cochrane, and Roy Lynam.  (*Strack*, ECF No. 191.131; *Merrell*, ECF No. 138.107; *Strack*, ECF Nos. 191.247, 191.67, 191.203–204, 191.185, 191.187; *Cochrane*, ECF No. 148.124; *Strack*, ECF No. 191.269.)

32.     The remaining nine plaintiffs sold their units to Siskey *after* the amendments became effective: Mallory Johnson, Robert Nastase, Rita Dilling, Lyle and Jeanette Ranson, Craig and Wanda Miller, Charles Short, and Dallas Pendry, Jr.  (*Strack*, ECF No. 191.75; *Merrell*, ECF No. 138.184; *Strack*, ECF No. 191.229; *Merrell*, ECF Nos. 138.109, 138.110, 138.58; *Short*, ECF No. 36.85; *Strack*, ECF No. 191.224.)

### D.     Relevant Events that Followed the Sales

33.     On 27 May 2010, CBB entered into an Agreement and Plan of Merger with SunTx affiliates Southern Belle Holdings, LLC and Southern Belle Merger Sub, LLC, which, after closing on 6 August 2010, resulted in a substantial restructuring of CBB, with CBB effectively merging with SunTx affiliate Southern Belle Merger Sub, LLC, and produced significant payments to CBB members.   (M. Smith Aff. ¶¶ 129–30, 133.)

34.     At the time of the merger with SunTx, Siskey owned approximately 15.75 units of CBB, and he received approximately $22,158,642.18 in distributions from

CBB between 2009 and 2013. (*See* Second Am. Compl. ¶ 132, *Strack*, ECF No. 33.) Siskey purchased 12.50 of his 15.75 units for approximately $3,180,000.00. (*Merrell*, ECF No. 138.32, R. Ex. Smith-31.)

### III.   PROCEDURAL BACKGROUND

35.   The Court sets forth here only those portions of the procedural history relevant to its determination of the Motions.

36.   The *Merrell*, *Strack*, and *Cochrane* matters were each initiated in late 2019. *Merrell* was filed on 8 November 2019, (*Merrell*, ECF No. 2), *Strack* on 14 November 2019, (*Strack*, ECF No. 3), and *Cochrane* on 12 December 2019, (*Cochrane*, ECF No. 3). The plaintiffs in each of these actions filed amended complaints on 28 January 2020, (*Merrell*, ECF Nos. 18, 19; *Strack*, ECF Nos. 27, 28; *Cochrane*, ECF No. 7), and those in *Merrell* and *Strack* filed Second Amended Complaints in those actions on 10 March 2020, (*Merrell*, ECF Nos. 23, 24; *Strack*, ECF Nos. 32, 33).

37.   The *Short* action was initiated on 20 September 2021, (*Short*, ECF No. 3), and subsequently amended as of right on 20 October 2021, (*Short*, ECF No. 11).

38.   The Smiths filed answers to the Second Amended Complaints in *Merrell*, (*Merrell*, ECF No. 39), and *Strack*, (*Strack*, ECF No. 54), and to the Amended Complaint in *Cochrane*, (*Cochrane*, ECF No. 38), on 23 April 2020. On 17 November 2021, the Smiths filed their answer to the Amended Complaint in *Short*. (*Short*, ECF No. 12.)

39.     Following full briefing, the Court held a hearing on the Motions and related motions on 25 and 26 August 2022 (the "Hearing"), at which all parties to the Motions were present and represented by counsel.

40.     On 2 September 2022, Plaintiffs' counsel filed Plaintiffs' verifications to the allegations of the operative complaints.  (*See, e.g., Strack*, ECF Nos. 260, 260.1–.10.) Defendants' counsel subsequently filed a joint objection to the verifications and moved to strike.  (*See, e.g., Strack*, ECF No. 263.)  After full briefing, the Court overruled the objection and denied the motion to strike.  (*Strack*, ECF No. 268; *Merrell*, ECF No. 177; *Cochrane*, ECF No. 185; *Short*, ECF No. 74.)  However, the Court also ruled that it would not consider the operative complaint of each Plaintiff as an affidavit for purposes of the pending summary judgment motions because the verifications were untimely.  (*Strack*, ECF No. 268; *Merrell*, ECF No. 177; *Cochrane*, ECF No. 185; *Short*, ECF No. 74.)

41.     The Motions are ripe for resolution.

## IV.    LEGAL STANDARD

42.     Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."  N.C.G.S. § 1A-1, Rule 56(c).  "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83 (2000).

43. The moving party bears the burden of showing that there is no genuine issue of material fact, and that the movant is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563 (2008). The movant may make the required showing by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim." *Dobson*, 352 N.C. at 83 (citations omitted).

44. "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85 (2000).

45. The Court must view the evidence in the light most favorable to the nonmovant. *Dobson*, 352 N.C. at 83. However, the nonmovant

> may not rest upon the mere allegations or denials of their pleading, but their response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If [the nonmovant] does not so respond, summary judgment, if appropriate, shall be entered against [the nonmovant].

N.C.G.S. § 1A-1, Rule 56(e).

## V.     ANALYSIS

46. Plaintiffs argue that summary judgment is proper against Mike Smith on their claims for breach of fiduciary duty because he owed Plaintiffs a "legal fiduciary

duty" which the undisputed evidence establishes that he breached as a matter of law.[11]  (*See* Pls.' Mem. Supp. Summ. J. 10, *Merrell*, ECF No. 145 ["Br. Supp. Mot."].)

47.    "To establish a claim for breach of fiduciary duty, a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff." *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 339 (2019).

48.    "The North Carolina Limited Liability Company Act does not create fiduciary duties among members.  As a general rule, members of a limited liability company are like shareholders in a corporation in that members do not owe a fiduciary duty to each other or to the company." *Emrich Enters. v. Hornwood, Inc.*, 2022 NCBC LEXIS 19, at **42 (N.C. Super. Ct. Feb. 15, 2022) (internal marks and citations omitted).  "The rights and duties of LLC members are ordinarily governed by the company's operating agreement, not by general principles of fiduciary relationships."  *Id.* (quoting *Strategic Mgmt. Decisions v. Sales Performance Int'l*, 2017 NCBC LEXIS 69, at *10–11 (N.C. Super. Ct. Aug. 7, 2017)).

49.    However, in some circumstances, "a holder of a majority interest who exercises control over the LLC owes a fiduciary duty to minority interest members." *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *17 (N.C. Super. Ct. June 19, 2019).  "Thus, when the operating agreement confers controlling authority

---

[11] Plaintiffs' Memorandum in Support of the Motion for Summary Judgment in the four actions is nearly identical, and thus, as stated herein at footnote 4, the Court cites only to one.

on the majority member, [the majority member] owes a duty not to use its control to harm the minority, assuming no other provision disclaims such a duty." *Id.* at *21.

50. This Court in *Vanguard* specified several factors which may reflect a majority manager's exercise of sufficient control over the LLC to create a fiduciary duty owed to the minority: (1) control over the LLC's board of directors; (2) the ability to dissolve the LLC; (3) the ability to put the LLC into bankruptcy; and (4) the ability to amend the LLC's operating agreement without approval from other members. *Id.* at *19–21. The exercise of control through these means weighs in favor of finding a fiduciary duty from majority member to the LLC's minority members. *Id.* at *21.

51. At the same time, however, "only when one party figuratively holds all the cards -- all the financial power or technical information, for example -- have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." *Kaplan v. O.K. Techs., LLC*, 196 N.C. App. 469, 475 (2009). "The scope of this exception [to the general proposition that LLC members do not owe a fiduciary duty to each other], borrowed from precedents governing corporations, remains unsettled and 'this Court has cautioned against a broad application because of the fundamental differences between LLCs and corporations.'" *Bennett v. Bennett*, 2019 NCBC LEXIS 19, at *19 (N.C. Super. Ct. Mar. 15, 2019) (quoting *Strategic Mgmt. Decisions*, 2017 NCBC LEXIS 69, at *11). Courts have routinely refused to extend precedents borrowed from corporations to LLCs because minority members have a much greater ability to negotiate for protections in the operating agreement than do shareholders in the corporate context. *See Bennett*, 2019 NCBC LEXIS 19, at *20;

*Fiske v. Kieffer*, 2016 NCBC LEXIS 22, at *10 (N.C. Super. Ct. Mar. 9, 2016); *Island Beyond, LLC*, 2013 NCBC LEXIS 48, at *15–16 (dismissing a claim for breach of fiduciary duty against the LLC's manager, even though the operating agreement provided the manager "complete authority to 'sell, exchange, transfer or convey any, all or substantially all of the assets of the company,' without member approval").

52.     Plaintiffs argue that, as the majority member of CBB, Mike Smith owed them a fiduciary duty.  (Br. Supp. Mot. 9.)  They argue that Mike Smith breached that duty when he provided Siskey with inside information unavailable to Plaintiffs—in particular the information contained in the December 2006 email from Mike Smith to Siskey.  (Br. Supp. Mot. 9.)  Plaintiffs further argue that they "relied on information omitting material facts which proximately caused a loss of liquidation funds" to Siskey.  (Br. Supp. Mot. 9.)  Plaintiffs thus contend that, had they known about the real value of their ownership stake in CBB and the interest of third parties in buying the company, they would not have sold their units when they did.  (Br. Supp. Mot. 10.)

53.     Mike Smith contends in opposition that he did not owe Plaintiffs a fiduciary duty.  (Mike Smith Br. Opp. Mot. 23, *Merrell*, ECF No. 157 ["Opp. Br."].)  He argues that, even with 52% ownership, he did not control CBB or dominate minority members' interests or rights, and that Plaintiffs do not argue otherwise—rather they rely solely on Mike Smith's status as majority member.  (Opp. Br. 25.)

54.     The Court agrees with Mike Smith that he did not owe Plaintiffs a fiduciary duty as a matter of law solely on the basis that he was a majority member, given that

it is well settled that the rights and duties of LLC members are governed by the LLC's operating agreement. *See Emrich Enters.*, 2022 NCBC LEXIS 19, at \*\*42. To the contrary, to prevail, Plaintiffs must also establish that Mike Smith actually had, and exercised, control over CBB in order to prove that he owed them a fiduciary duty. *See Vanguard*, 2019 NCBC LEXIS 39, at \*17, \*21.

A. <u>**Plaintiffs who sold to Siskey under the 2003 Operating Agreement**</u>

55. Prior to the 2007 amendment to the CBB Operating Agreement, Mike Smith was unable to unilaterally exercise control over CBB members under any of the four *Vanguard* factors. He did not have exclusive managerial control over the LLC's board of directors, he did not have the exclusive ability to dissolve the company, (*see* 2000 Operating Agreement 11, § 6.1), and he did not have the ability to unilaterally amend the Operating Agreement, as unanimous approval of the members was required, (*see* 2000 Operating Agreement § 9.9). The Operating Agreement did not address a manager's ability to declare bankruptcy.

56. While Mike Smith was the majority member of CBB when the first group of Plaintiffs sold their units pursuant to the 2003 amendments to the 2000 Operating Agreement, he did not hold all of the financial power or technical information of CBB such that a fiduciary relationship arose between Mike Smith and the minority members as a matter of law. In fact, the Operating Agreement precluded the LLC's managers from taking certain actions without the approval of either 100% or 75% of the members. It also provided minority members with the right to access the company's "financial books, records and documents during normal business hours"

and make copies of "any of them" upon reasonable notice to the LLC. (2000 Op. Agreement 7, § 4.4, 9–10, § 5.2.) The Operating Agreement also permitted members to request "information regarding the status of the business and the financial condition of the Company" and, among other things, "such other information regarding the affairs of the Company as is just and reasonable." (2000 Op. Agreement 10, § 5.2.)

57.     Further, Mike Smith did not have the exclusive ability to permit Plaintiffs to sell their ownership interest in CBB—65% member approval on unit sales was required under the 2003 amendments to the 2000 Operating Agreement, and Mike Smith could only provide 52% member approval if acting alone. (*See, e.g., Short*, ECF No. 36.54, R. Ex. 244) (identifying numerous Consent Agreements signed by Mike Smith and three others prior to the 2007 amendments).

58.     Accordingly, the Court concludes that plaintiffs James Wilson, Carl Merrell, Pamela Boileau, Jeffrey and Penny Strack, Kent Kalina, Carolyn Crozier, individually and as the executor of the Estate of Thomas J. Crozier, Jr., Jeff Cochrane and Gary Cochrane, as administrators of the Estate of Ralph N. Cochrane, and Roy Lynam have failed to establish that Mike Smith exercised sufficient control of the LLC to owe them a fiduciary duty as a matter of law. Summary judgment on these plaintiffs' claims for breach of fiduciary duty must therefore be DENIED.

**B.     Plaintiffs who sold to Siskey under the 2007 Operating Agreement**

59.     After the 2007 Operating Agreement became effective on 18 December 2007, Mike Smith, who held a 52% interest in CBB, was permitted to act unilaterally

with respect to the sale of the remaining Plaintiffs' units and did in fact act unilaterally in consenting to the sale of their CBB units. (*See, e.g., Short*, ECF No. 36.54, R. Ex. 244.) Mike Smith was also able to unilaterally amend the Operating Agreement. (*See* 2007 Am. Op. Agreement 21, § 9.9.) While these powers are indicative of *some* control, they establish only one of the four *Vanguard* factors, which, alone, is insufficient to establish that Mike Smith effectively controlled CBB and thus owed CBB's minority members a fiduciary duty as a matter of law.

60. Additionally, Section 4.7 of the 2007 Operating Agreement provides that "any Member or Manager may engage independently or with others in other business ventures of every nature and description even if competitive with the business of the Company." (2007 Am. Op. Agreement 8.) The 2007 Operating Agreement does not otherwise provide for any fiduciary or fiduciary-like duties and, in fact, is reasonably interpreted to *renounce* such duties. *See Bennett*, 2019 NCBC LEXIS 19, at *16–17 (providing that where provisions in an operating agreement "disclaim fiduciary or fiduciary-like duties on the part of members or managers[,]" it is evidence supporting a conclusion that no fiduciary duties were owed). After the amendment, the plain language of the 2007 Operating Agreement still provided minority members with the ability to investigate and request documents as described above. This, too, undermines Plaintiffs' contention that Mike Smith owed them a fiduciary duty as a matter of law.

61. Finally, given that the scope of this "control" exception is "unsettled" and North Carolina courts have cautioned against its broad application, the Court is not

prepared to conclude that Mike Smith owed Plaintiffs a fiduciary duty as a matter of law given the disputed facts, discussed above, concerning the degree to which he exercised control over CBB.

62.     Therefore, the Court concludes that plaintiffs Mallory Johnson, Robert Nastase, Rita Dilling, Lyle and Jeanette Ranson, Craig and Wanda Miller, Charles Short, and Dallas Pendry, Jr. have failed to establish that they are entitled to judgment as a matter of law against Defendant James Michael Smith as to liability on their breach of fiduciary duty claim.

63.     Given that Plaintiffs have not met their burden on the Motions as to the first required element of the breach of fiduciary duty claim, the Motions are DENIED, and the Court need not and does not address alternative arguments made in support of the Motions.

## VI.     CONCLUSION

64.     **THEREFORE**, for the foregoing reasons, the Court hereby **DENIES** the Motions.


          **SO ORDERED**, this the 13th day of December, 2022.



                              /s/ Michael L. Robinson
                              Michael L. Robinson
                              Special Superior Court Judge
                                for Complex Business Cases