Orange Peel Events, LLC v. Ninja Brewing, Inc., 2025 NCBC 39.

STATE OF NORTH CAROLINA

BUNCOMBE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV000040-100

ORANGE PEEL EVENTS, LLC, a
North Carolina limited liability
company; and PUBLIC INTEREST
PROJECTS, INC., a North Carolina
corporation, in its corporate capacity,

Plaintiffs,

v.

NINJA BREWING, INC., f/k/a
ASHEVILLE PIZZA & BREWING
COMPANY, a North Carolina
Corporation; and ASHEVILLE
BREWING PROPERTIES, LLC, a
North Carolina limited liability
company,

Defendants.

**ORDER AND OPINION
ON MOTIONS TO DISMISS**

1. This dispute concerns the management and operation of an outdoor entertainment venue in western North Carolina. Each side has moved to dismiss claims asserted by the other. For the following reasons, the Court **GRANTS** the plaintiffs' motion and **GRANTS in part** and **DENIES in part** the defendants' motion.

> *Searson, Jones, Gottschalk & Cash, PLLC, by W. Scott Jones, Tikkun A.S. Gottschalk, and Stephen L. Cash, for Plaintiffs Orange Peel Events, LLC and Public Interest Projects, Inc.*
>
> *Allen Stahl & Kilbourne, PLLC, by Christopher G. Lewis and Robert C. Carpenter, for Defendants Ninja Brewing, Inc. f/k/a Asheville Pizza & Brewing Co. and Asheville Brewing Properties, LLC.*

Conrad, Judge.

# I.
# BACKGROUND

2. The following background is drawn from the allegations in the amended complaint.

3. Orange Peel Events, LLC books and manages live music shows at a range of outdoor venues in Asheville, North Carolina and the surrounding area. Its only member is Public Interest Projects, Inc. (*See* Am. Compl. ¶¶ 8, 41, ECF No. 42.)

4. Ninja Brewing, Inc. operates a brewery and pizzeria in downtown Asheville. A sister company, Asheville Brewing Properties, LLC, owns the pizzeria's real estate. Ninja and Asheville Brewing share common ownership. (*See* Am. Compl. ¶¶ 10, 13.)

5. The parties' dealings go back to 2019, when the lot next to Ninja's pizzeria went up for sale. Ninja's owners wanted to buy the lot but lacked the means, so they approached Orange Peel with a business proposal. The basic idea was to acquire the lot jointly and turn it into a year-round, outdoor entertainment venue, with Orange Peel to put on live music shows in the warm season and Ninja to operate an outdoor movie theater in cooler months. To go with the entertainment, Ninja would also run a biergarten-style pizza restaurant. (*See* Am. Compl. ¶¶ 13, 42, 43, 45.)

6. Orange Peel was receptive to this idea. It alleges that the parties agreed "to form a joint venture" to be called Rabbit Rabbit. The original concept called for the formation of two new LLCs—one to buy and own the land and another to manage the entertainment venue. Public Interest and Asheville Brewing were to split membership in the land-owning LLC equally, and Orange Peel and Ninja were to split membership in the venue-management LLC equally. But a lawyer representing

Ninja and Asheville Brewing allegedly advised that forming a venue-management LLC would complicate alcohol sales under governing laws. His solution was to have the land-owning LLC lease the land to Ninja and to have Ninja and Orange Peel manage the venue directly under a separate contract. (*See* Am. Compl. ¶¶ 47, 48, 50, 54, 64.)

7. And that is what the parties did. They first formed 75 Coxe Properties, LLC to buy the land. Public Interest and Asheville Brewing became equal members and managers of this new entity. Just a few months after buying the land, 75 Coxe Properties leased it to Ninja for a term of ten years, and Ninja and Orange Peel signed a management agreement for the leased property and the soon-to-be-built entertainment venue. Later, there came one last contract, dubbed the Green Room Lease, in which Ninja leased part of its adjacent property to Public Interest to be used as hospitality rooms for performing artists. (*See* Am. Compl. ¶¶ 12, 71, 77.)

8. The management agreement is central to this dispute. That agreement (as amended) identifies Ninja as the tenant with "control over all uses" of the property. Ninja kept "primary responsibility for managing and staffing food and beverage services, movies, televised events, small shows and special events and 3rd party vendors" but delegated to Orange Peel "primary responsibility for managing and staffing live music and comedy entertainment and large special events." Several provisions lay out how to calculate and apportion revenues and expenses for shows, special events, and day-to-day operations. Both sides agreed that they were "not partners or joint venturers with each other" but "recognize[d] their fiduciary duty to

act entirely in the best interest of the Parties' joint project and not elevate individual . . . self-interest above that duty." And Ninja reserved the right to terminate the agreement on 180-days' notice and retain a replacement management company. (Am. Compl. Ex. C §§ 1, 2, 4–6, 9, 17 ["Mgmt. Agrmt."], ECF No. 42.3.)

9. Live shows at the Rabbit Rabbit venue began in 2021. As alleged, over the next few years, Orange Peel's shows were profitable while Ninja's events flopped. Signs of enmity began to surface near the end of 2023 when Public Interest sent a notice of deadlock concerning the management of 75 Coxe Properties. Convinced that Ninja and Asheville Brewing were in financial distress, Public Interest advocated shoring up 75 Coxe Properties' reserves and halting cash distributions. Asheville Brewing downplayed its financial difficulties, denied any deadlock, and agreed to delay the next distribution until at least April 2024. Just a few weeks later, though, Asheville Brewing made a distribution without Public Interest's consent. Asheville Brewing initially refused Public Interest's demand to return the money but eventually did so about nine months later. Various disputes about how to account for expenses and profits emerged during this period as well. (*See, e.g.*, Am. Compl. ¶¶ 84, 86, 89, 91, 92, 94, 95, 101–03, 105, 107, 109, 113, 128, 130, 132, 133.)

10. Push came to shove in the summer of 2024. Ninja contacted Orange Peel's competitors about handling management of the venue's live shows and, soon after, gave notice that it intended to terminate the management agreement at the end of the year. Since then, Ninja has retained a new manager, rebranded the Rabbit Rabbit

venue as Asheville Yards, and rebooked shows that Orange Peel had booked and planned to manage in 2025. (*See, e.g.*, Am. Compl. ¶¶ 118, 123, 125, 137.)

11. In this case, Orange Peel and Public Interest assert that they have been unfairly ousted from the Rabbit Rabbit venue. They have advanced eight direct claims and two derivative claims on behalf of 75 Coxe Properties, alleging that Ninja and Asheville Brewing breached their fiduciary duties and the parties' contracts in sundry ways. They seek not only damages but also declaratory relief and punitive damages. Ninja and Asheville Brewing have counterclaimed, alleging that they have held true to their contractual duties but that Orange Peel and Public Interest have not.

12. Both sides have filed motions to dismiss. (ECF Nos. 46, 48.) Ninja and Asheville Brewing seek to dismiss six of the ten claims in the amended complaint.[1] Orange Peel and Public Interest seek to dismiss just one counterclaim. Both motions have been fully briefed, and the Court held a hearing on 15 July 2025. The motions are ripe.

II.
DEFENDANTS' MOTION TO DISMISS

13. A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of the complaint." *Isenhour v. Hutto*, 350 N.C. 601, 604 (1999) (citation and quotation marks

---

[1] Earlier, Ninja and Asheville Brewing had moved to dismiss most claims in the original complaint. (*See* ECF No. 21.) Following a hearing on that motion, however, both sides agreed to amend their pleadings with the Court's blessing, thus mooting the motion to dismiss. In their second motion, Ninja and Asheville Brewing raise more or less the same arguments as they raised before. To simplify matters, the Court allowed the parties to incorporate by reference their earlier briefing and supplement their arguments as appropriate.

omitted). The motion should be granted only when "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (citation and quotation marks omitted).

14. In deciding the motion, the Court must treat the well-pleaded allegations of the complaint as true and view the facts and permissible inferences "in the light most favorable to" the nonmoving party. *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332 (2019) (citation and quotation marks omitted). Exhibits to the complaint are deemed to be part of it and may also be considered, *see Krawiec v. Manly*, 370 N.C. 602, 606 (2018), but the Court need not accept as true any "conclusions of law or unwarranted deductions of fact," *Wray v. City of Greensboro*, 370 N.C. 41, 46 (2017) (citation and quotation marks omitted).

## A. Fiduciary Claims

15. In this section, the Court considers the first, fourth, and sixth claims in the amended complaint. These include Orange Peel's claim for breach of fiduciary duty, Public Interest's claim for breach of fiduciary duty, and their joint claim for misappropriation of corporate opportunity. Ninja and Asheville Brewing challenge this group of claims on the same ground: that the amended complaint does not adequately allege the existence of a fiduciary relationship among the parties.

16. "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651 (2001). The

same is true for a claim of misappropriation of corporate opportunity, which "is a species of the duty of a fiduciary to act with undivided loyalty." *Meiselman v. Meiselman*, 309 N.C. 279, 307 (1983) (citation and quotation marks omitted).[2]

17.    Orange Peel and Public Interest argue that a fiduciary relationship exists because they formed a joint venture with Ninja and Asheville Brewing to acquire, develop, and operate the Rabbit Rabbit venue. Even taking the amended complaint's allegations as true, though, they do not show that the parties entered into a joint venture.

18.    To plead a joint venture, a plaintiff must allege "an agreement, express or implied, to carry out a single business venture with joint sharing of profits" as well as "an equal right of control of the means employed to carry out the venture." *Sykes*, at 340–41 (cleaned up). Each joint venturer must have "a right in some measure to direct the conduct of the other through a necessary fiduciary relationship. Stated differently, each joint venturer must stand in the relation of principal, as well as agent, as to each of the other coventurers." *Cheape v. Chapel Hill*, 320 N.C. 549, 562 (1987) (cleaned up) (superseded by statute on other grounds).

19.    This principal–agent relationship is missing here. Consider, first, the management agreement. Over and over, it stresses that Ninja and Orange Peel are independent. Each "shall independently manage and be in charge of all functions

---

[2] It is arguable whether either Orange Peel or Public Interest may assert a claim for misappropriation of corporate opportunity. As our Supreme Court has explained, "the corporate opportunity doctrine provides that a corporate fiduciary may not appropriate to himself an opportunity that rightfully *belongs to his corporation*." *Meiselman*, 309 N.C. at 307 (emphasis added) (citation and quotation marks omitted). Neither side addresses this point, however.

within their respective areas of responsibility." (Mgmt. Agrmt. § 6.) And again, "[t]he Parties, at all times, shall be independent of each other," maintaining "autonomy in all payroll and employment-related duties and rights." (Mgmt. Agrmt. § 8.) Indeed, the agreement expressly disclaims any joint venture: "The parties to this Agreement are not partners or joint venturers with each other and nothing in this Agreement shall be construed so as to make them partners or joint venture[r]s . . . ." (Mgmt. Agrmt. § 17.d.)

20. Likewise, Asheville Brewing and Public Interest chose to form an LLC, not an unincorporated joint venture, to buy and own the land underlying the Rabbit Rabbit venue. Neither is the agent of the other under 75 Coxe Properties' operating agreement or the statutes governing LLCs. *See Cheape*, 320 N.C. at 561 (defining "joint venture" to mean an enterprise in which "profit is jointly sought, without any actual partnership or corporate designation" (citation and quotation marks omitted)); *Strategic Mgmt. Decisions, LLC v. Sales Performance Int'l, LLC*, 2017 NCBC LEXIS 69, at *14–15 (N.C. Super. Ct. Aug. 7, 2017) ("Plaintiff and Sales Performance chose to organize their joint enterprise as an LLC, and it is therefore subject to the laws governing LLCs."). And not even Orange Peel and Public Interest suggest that the parties' lease agreements evince an agency relationship, as opposed to a common landlord-tenant relationship.

21. To be sure, the amended complaint alleges in conclusory fashion that the parties formed a joint venture and agreed to share joint control. (*See, e.g.*, Am. Compl. ¶¶ 48, 65, 152.) But the Court need not accept conclusory allegations. Nor must it

accept "allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Laster v. Francis*, 199 N.C. App. 572, 577 (2009). Here, the agreements at issue refute the existence of a joint venture. *See Sykes*, 372 N.C. at 341 ("Thus, on the face of their contracts with HNS, plaintiffs agreed that no joint venture was formed via the parties' contractual relationship."); *Cheape*, 320 N.C. at 562 ("Thus, the agreement fails to place the Town and Fraser in the relation of principal, as well as agent, as to each other." (cleaned up)); *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 328 (2002) ("Accordingly, there is nothing in the agreement that establishes Chesson and SES as agents of the individual defendants and BTU. Likewise, there is nothing that establishes defendants as agents of plaintiffs.").

22.    As an alternative to their joint-venture theory, Orange Peel and Public Interest argue that the management agreement creates a fiduciary relationship between Ninja and Orange Peel.[3] They base this argument on the following language: "each Party recognizes their fiduciary duty to act entirely in the best interest of the Parties' joint project and not elevate . . . individual Party self-interest above that duty." (Mgmt. Agrmt. § 17.e.) Two things leap off the page. First, this comes on the heels of the language disclaiming any joint venture. Second, this does not say that the parties owe a fiduciary duty to one another—only to their "joint project." It would be unreasonable to read these words in a way that either creates the very joint

---

[3] As counsel acknowledged at the hearing, the management agreement does not concern Asheville Brewing and Public Interest. Thus, even if the management agreement imposed a limited fiduciary duty on Ninja, that would not support Public Interest's claim for breach of fiduciary duty or the claim for misappropriation of corporate opportunity.

venture that the parties disclaimed or imposes a duty obligating each contracting party to act in the other's best interest.

23. Accordingly, the Court grants the motion to dismiss Orange Peel's claim for breach of fiduciary duty, Public Interest's claim for breach of fiduciary duty, and their claim for misappropriation of corporate opportunity.

## B. Breach of the Management Agreement

24. The second and third claims for relief are next. In these claims, Orange Peel alleges that Ninja breached the management agreement by terminating it in bad faith and seeks a declaratory judgment that the termination was invalid. As Ninja correctly observes, though, the management agreement unambiguously allows either party to terminate it without cause so long as adequate notice is given. (*See* Mgmt. Agrmt. § 2.) Because Orange Peel does not allege or contend that Ninja failed to give timely notice, it has not stated a claim for breach of the management agreement's termination clause.

25. In its opposition, Orange Peel argues that the parties' right to terminate was limited by their obligation, found elsewhere in the agreement, to act "in the furtherance of the best interest of the Parties' joint efforts and for the Parties' mutual benefit." (Mgmt. Agrmt. § 17.e.) But that would negate the termination clause altogether. It is, after all, hard to imagine a realistic scenario in which one side's decision to terminate the agreement would serve their *mutual* benefit. Ordinary canons of construction forbid taking one contract clause out of context and employing it to erase another. *See, e.g., WakeMed v. Surgical Care Affiliates, LLC*, 243 N.C.

App. 820, 824 (2015) (observing that, "if possible, every word and every provision is to be given effect" (citation and quotation marks omitted)).

26.     Orange Peel also contends that the management agreement bars Ninja from negotiating with other management companies more than ninety days before termination.  It does not.  Rather, it states that Orange Peel "shall have no rights whatsoever to impede or prohibit" Ninja's negotiations with others during that ninety-day period.  (Mgmt. Agrmt. § 2.)  Nothing in that language restrains Ninja from beginning negotiations earlier.

27.     As a result, the amended complaint does not state a valid claim for breach based on Ninja's termination of the management agreement or negotiation with competing management companies.  The parallel claim for declaratory relief likewise fails.  *See VanFleet v. City of Hickory*, 2020 NCBC LEXIS 40, at *10 (N.C. Super. Ct. Mar. 30, 2020) (dismissing duplicative claim for declaratory judgment along with underlying claim for breach of contract).

28.     This does not dispose of all of the second claim for relief, however.  Orange Peel goes on to allege in paragraphs 165(c) through (f) that Ninja undercounted its revenue, overcounted its reimbursements, refused to approve Orange Peel's reimbursements, and failed to pay for green room upfits.  Ninja seeks to dismiss this portion of the claim on the ground that it duplicates Orange Peel's fifth claim for relief, which is also styled as a claim for breach of the management agreement.  Having reviewed the two sets of allegations, they do not appear to be cumulative, as

Ninja contends. Accordingly, the Court denies the motion to dismiss the second claim for relief as to the allegations in paragraphs 165(c) through (f).

## C. Declaratory Judgment

29. Ninja and Asheville Brewing also challenge the seventh claim for relief. This claim concerns a cash distribution that Asheville Brewing allegedly made from 75 Coxe Properties' accounts without Public Interest's consent in March 2024. Public Interest claims that the distribution wasn't proper and seeks a declaration that 75 Coxe Properties' operating agreement permits cash distributions only with the consent of a majority in interest of the company's membership.

30. A complaint sufficiently states a claim for declaratory judgment if it "alleges the existence of a real controversy arising out of the parties' opposing contentions and respective legal rights under a . . . contract." *Morris v. Plyler Paper Stock Co.*, 89 N.C. App. 555, 557 (1988). Dismissal is appropriate only "when the complaint does not allege an actual, genuine existing controversy." *N.C. Consumers Power, Inc. v. Duke Power Co.*, 285 N.C. 434, 439 (1974).

31. Asheville Brewing insists that there is no actual controversy. The Court disagrees. Asheville Brewing did not, as it contends, concur with Public Interest's interpretation in the parties' prelitigation correspondence. At most, Asheville Brewing agreed to delay any distribution until April 2024, without conceding that it had no right to make a distribution afterward. (*See* Am. Compl. Ex. F, ECF No. 42.6.) And, of course, Asheville Brewing went on to make a distribution without Public Interest's consent just a few weeks later, reneging on its promise to hold off until

April and removing any doubt about the parties' opposing stances. True, Asheville Brewing returned the distribution nine months later. But that was not a reconciliation. Asheville Brewing hasn't admitted that it did anything wrong. And in fact, it has asserted its own counterclaim for declaratory judgment, seeking a declaration that Public Interest "is required to consent to" a distribution. (Am. Countercl. ¶ 90, ECF No. 43.)

32. The Court denies the motion to dismiss Public Interest's claim for declaratory judgment.

### D. Punitive Damages

33. Ninja and Asheville Brewing also seek to dismiss the amended complaint's demand for punitive damages. This issue is premature. The derivative claim for breach of fiduciary duty (which the motion to dismiss does not address) could support punitive damages, if successful. The Court therefore denies the motion to dismiss the demand for punitive damages.

### III.
### PLAINTIFFS' MOTION TO DISMISS

34. Little needs to be said about the plaintiffs' motion to dismiss. All that is at issue is Asheville Brewing's counterclaim for breach of fiduciary duty against Public Interest. Having prevailed on its own motion to dismiss the claims for breach of fiduciary duty against it, Asheville Brewing agrees that this counterclaim ought to be dismissed as well. Accordingly, the Court grants the plaintiffs' motion to dismiss.

## IV.
## CONCLUSION

35. For these reasons, the Court **GRANTS in part** and **DENIES in part** the defendants' motion to dismiss. The Court **DISMISSES** with prejudice the first, fourth, and sixth claims for relief in the amended complaint. The Court **DISMISSES** without prejudice the second and third claims for relief in the amended complaint, excluding the portions of the second claim for relief that appear in paragraph 165(c)–(f). The Court **DENIES** the motion in all other respects.

36. In addition, the Court **GRANTS** the plaintiffs' motion to dismiss and **DISMISSES** with prejudice the seventh cause of action in the amended counterclaims.

**SO ORDERED**, this the 30th day of July, 2025.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
for Complex Business Cases