IN THE SUPREME COURT OF NORTH CAROLINA

No. 318A24

Filed 17 October 2025

ARMISTEAD B. MAUCK and LOUISE CHERRY MAUCK

v.

CHERRY OIL CO., INC., JULIUS P. "JAY" CHERRY, JR., and ANN B. CHERRY

Appeal pursuant to N.C.G.S. § 7A-27(a)(2) from an order and opinion entered on 2 May 2022 on defendants' motion to dismiss and from an order and opinion entered on 15 September 2023 on defendants' motion for summary judgment by Judge Mark A. Davis, Special Superior Court Judge for Complex Business Cases, in Superior Court, Lenoir County, after the case was designated a mandatory complex business case by the Chief Justice pursuant to N.C.G.S. § 7A-45.4(b). Heard in the Supreme Court on 23 April 2025.

*Williams Mullen, by Walter L. Tippett Jr. and Lewis H. Hallowell, for plaintiff-appellants.*

*Womble Bond Dickinson (US) LLP, by Samuel B. Hartzell, Matthew F. Tilley, and Pressly M. Millen, for defendant-appellees.*

EARLS, Justice.

Cherry Oil is a closely held corporation that distributes propane and refined fuel in eastern North Carolina. Armistead and Louise Mauck together own 34% of the company's shares. In 2021, the Maucks sued to dissolve Cherry Oil under N.C.G.S. § 55-14-30(2)(ii), arguing that liquidating the corporation was "reasonably

necessary" to protect their "rights or interests" as shareholders. The Business Court dismissed that claim for lack of standing under Rule 12(b)(1). We ultimately affirm the dismissal of this claim, but on alternate grounds.

Contrary to the Business Court's opinion, the Maucks had standing to bring their claim. They allege the violation of a legal right secured by N.C.G.S. § 55-14-30(2)(ii), and they fall within the class of people the statute authorizes to sue. That is enough to establish standing in North Carolina. *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 599 (2021).

Even so, the Business Court was right to dismiss this claim, and we affirm the dismissal under Rule 12(b)(6). The complaint is appropriately dismissed because it alleges the existence of a provision in the shareholder agreement that grants the Maucks the right to sell their shares back to Cherry Oil at fair market value—essentially the same relief they seek through judicial dissolution under N.C.G.S. § 55-14-30(2)(ii). Exercising this provision avoids the collateral fallout that would flow from shutting down the company, firing all of its employees, and selling its assets piecemeal. Where the shareholder agreement provides this buyback option, without further factual allegations that dissolution is "reasonably necessary" to protect the Maucks' rights or interests and that the Maucks are entitled to some form of equitable relief under the circumstances, dismissal is warranted. We therefore affirm the Business Court's dismissal under Rule 12(b)(6), along with its other rulings on appeal.

## I.   Background

### A. Facts

Cherry Oil started as a family business in 1928. Over the years, it grew from a small-town fuel distributor into a regional energy company with operations in propane and refined fuels, a network of convenience stores, and a portfolio of affiliated real estate ventures. It has always been managed by members of the extended Cherry family.

Louise and Jay, siblings, were born into the Cherry family and both ultimately joined the family business in leadership roles, although they followed different paths to get there. Jay began working for Cherry Oil first, alongside his father. In the mid-1990s, Jay's father's health began to decline, and Cherry Oil came under financial strain as well. Jay and his father turned to Armistead, Louise's spouse and a banker by trade, and asked him to join the company to help right the ship. Armistead had not previously been involved with the family business, but he agreed to leave his successful banking career and join Cherry Oil after reaching an agreement with Jay. At that point, Jay's father transitioned into retirement.

Jay and Armistead's initial agreement was straightforward: the Cherrys (Jay and his spouse, Ann) and the Maucks (Armistead and his spouse, Louise) would share the responsibilities and the benefits of Cherry Oil equally. As is common in many family businesses, everyone tried to work together in good faith, and Cherry Oil did not always strictly adhere to corporate formalities.

Notably, however, the families did go through the process of enacting, with assistance of counsel, a formal Shareholder Agreement in 1998. That Shareholder Agreement gave the company the right to "call" anyone's shares; in other words, to force a shareholder to sell all of their shares back to the company at fair market value. Conversely, each shareholder was also given the right to "put" all of their shares up and force the company to purchase them at fair market value. The Shareholder Agreement set out—in pages and pages of detail—the process for valuing and repurchasing shares. It also included a provision noting that any party could seek specific performance of the call or put provisions.

For many years, the partnership worked. Cherry Oil and its affiliates—C-Gas, LLC and AJAL Investments, LLC—expanded under shared control. The couples worked together, made decisions by consensus, and split responsibilities in ways that reflected mutual trust and interdependent roles.

But the harmony did not last. Eventually, Jay began planning for retirement, and his son Jason stepped into a larger role. The Maucks raised concerns about Jason's competence and objected to leadership changes they viewed as sidelining them. In 2020, long-simmering tensions reached a boil. Disagreements over Jason's promotion became a broader dispute over control, profit-sharing, and the future of the company.

Things reached a head on 16 June 2021, when Jay and Ann called a shareholder meeting with Armistead and Louise. At the time, all four still served on

the board. Exercising their 66% voting majority, Jay and Ann voted to remove Louise from the board. Once Louise was out, Jay and Ann convened the newly reconstituted board and voted to "call" the Maucks' shares under the Shareholder Agreement.

Though Cherry Oil made two attempts to buy out the Maucks, neither deal closed. The Maucks say that the Cherrys backed out. The Cherrys say the Maucks blocked the process by contesting the call vote and dragging their feet despite repeated efforts to complete the buyout. Everyone agrees, however, that the Maucks remain minority shareholders in Cherry Oil. It is also clear that the Maucks are no longer employed by the company.

**B. Procedural History**

The Maucks sued in May 2021, naming Cherry Oil, Jay Cherry, and Ann Cherry as defendants. They brought a mix of individual and derivative claims, including judicial dissolution under N.C.G.S. § 55-14-30, breach of fiduciary duty, constructive fraud, and breach of the 1998 Shareholder Agreement. The case was designated a mandatory complex business case and assigned to the North Carolina Business Court.

On 13 December 2021, the Maucks filed a verified Second Amended Complaint. Defendants moved to dismiss most claims under Rules 12(b)(1) and 12(b)(6). On 2 May 2022, the Business Court granted that motion in large part.

The court dismissed the judicial dissolution claim for lack of standing. It reasoned that the 1998 Shareholder Agreement provided the Maucks with a clear

contractual exit from their involvement in Cherry Oil: a complementary call and put mechanism guaranteeing the right to sell their shares back to Cherry Oil at fair market value. That remedy, the court held, satisfied the Maucks' "reasonable expectations" and foreclosed equitable relief under N.C.G.S. § 55-14-30. It did not matter whether the option had been properly executed—only that the right existed.

The court dismissed the first breach of contract claim, which was based on an alleged oral promise from Jay to transfer certain shares to Armistead. The court held that the claim was untimely. The alleged breach occurred in 2010, and even though Jay did not repudiate the deal until 2020, the court concluded that the clock started when Jay failed to perform. Relying on *Christenbury Eye Center, P.A. v. Medflow, Inc.*, 370 N.C. 1 (2017), the court held that a decade-long delay was too long to wait.

The court dismissed the individual claims for constructive fraud, reasoning that the complaint failed to allege a sufficient "personal benefit" that the Cherrys had secured for themselves.

As for the derivative claims, the court found no injury to the corporation and no allegations of self-dealing—both necessary elements for derivative standing and constructive fraud. At bottom, the complaint described a family power struggle, not corporate harm. The court also held that the complaint failed to plead facts sufficient to overcome the business judgment rule.

That left just two causes of action: an individual fiduciary duty claim against Jay and Ann Cherry and a breach of contract claim based on the company's alleged

failure to close the buyout.

On 14 April 2023, the defendants moved for summary judgment. The court granted the motion on 15 September 2023. As to the fiduciary duty claim, the court found that there was insufficient evidence that the defendants had breached any duties owed to the Maucks as minority shareholders. Removing Louise from the board of directors, terminating the Maucks' employment with the company, and invoking the call right were all valid corporate acts.

On the contract claim, the court noted that the Maucks had shifted theories. The Maucks initially claimed that the Cherrys failed to follow through on the call and close the buyout within 60 days. At summary judgment, the Maucks argued that the exercise of the call option was invalid from the start. The court rejected both theories. The Agreement did not require a set price before the call, and the record showed Cherry Oil's repeated efforts to close the deal. The holdup, in the court's view, came from the Maucks, who refused to recognize the call's legitimacy.

Defendants dismissed all of their counterclaims by April 2024. Final judgment followed on 14 June 2024. The Maucks timely appealed.

## II. Standard of Review

We review de novo the legal conclusions of a trial court, including orders granting or denying a motion to dismiss under Rule 12 or a motion for summary judgment under Rule 56. *E.g.*, *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332 (2019).

In conducting our de novo review of an order on a Rule 12 motion, we treat the allegations of the complaint as true and view them in the light most favorable to the non-moving party. *Id.* This same standard applies regardless of whether the complaint was dismissed below for lack of subject matter jurisdiction or for failure to state a claim. *United Daughters of the Confederacy, N.C. Div. v. City of Winston-Salem*, 383 N.C. 612, 624 (2022). That being said, while our review of an order on a Rule 12(b)(6) motion is typically limited to the allegations in the complaint, review of an order on a Rule 12(b)(1) motion "may consider information outside the scope of the pleadings in addition to the allegations set out in the complaint." *Id.* Dismissal under Rule 12(b)(1) is proper only if the trial court lacks jurisdiction over the subject matter of the claim. N.C.G.S. § 1A-1, Rule 12(b)(1) (2023). In contrast, dismissal is proper under Rule 12(b)(6) whenever, as a matter of law, the allegations of the complaint, treated as true, are insufficient to state a claim upon which relief can be granted under some legal theory. *Bridges v. Parrish*, 366 N.C. 539, 541 (2013).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2023). "All facts asserted by the adverse party are taken as true, and their inferences must be viewed in the light most favorable to that party." *Sykes*, 372 N.C. at 332 (cleaned up). "The showing required for summary judgment may be accomplished by proving an essential

element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense." *Id.* (cleaned up).

## III.    Analysis

### A. Judicial Dissolution

We first examine the Business Court's dismissal of the Maucks' claim for judicial dissolution under N.C.G.S. § 55-14-30(2)(ii).

#### 1. *Standing under Rule 12(b)(1).*

The Business Court held the Maucks lacked standing to seek judicial dissolution. As explained below, this was error.

Standing, put simply, is a person's right to assert "a legal claim or seek judicial enforcement of a duty or right." *Comm. to Elect Dan Forest*, 376 N.C. at 564 (cleaned up). It is essential to a court's subject matter jurisdiction. *United Daughters of the Confederacy, N.C. Div.*, 383 N.C. at 629. That said, North Carolina's Constitution "opens the courthouse doors to all who suffer injury." *Fearrington v. City of Greenville*, 386 N.C. 38, 45 (2024). A plaintiff therefore has standing if they "allege[ ] the infringement of a legal right arising under a cause of action at common law, a statute, or the North Carolina Constitution." *Comm. to Elect Dan Forest*, 376 N.C. at 608. In those cases, we have explained, the "legal injury itself" unlocks the courthouse doors. *Id.*

This case turns on statutory standing because the Maucks seek judicial dissolution under N.C.G.S. § 55-14-30(2)(ii). The legislature, we have recognized,

enjoys broad power to create causes of action. *Id.* at 609. When "the legislature exercises its power to create a cause of action under a statute," a plaintiff has standing if they belong to the "class" of people statutorily entitled to sue. *Id.* at 608.

By its terms, N.C.G.S. § 55-14-30(2) creates a cause of action. It authorizes shareholders to bring—and superior courts to hear—a "proceeding" to dissolve a corporation. N.C.G.S. § 55-14-30(2) (2023). The legislature defined "proceeding" to include civil actions. N.C.G.S. § 55-1-40(18) (2023).

The statute also spells out the class of people who may sue. The specific sub-section at issue here authorizes proceedings "by a shareholder," and it identifies the legal injury at issue as the impairment of "the rights or interests of the complaining shareholder." N.C.G.S. § 55-14-30(2)(ii). So, the statute both grants a cause of action and makes clear who holds it.

The Maucks are squarely within the class of people that N.C.G.S. § 55-14-30(2)(ii) protects. They allege that they are shareholders in Cherry Oil, owning 34% of its outstanding shares. They claim that the majority shareholders—the Cherrys—have frustrated their reasonable expectations and thereby impaired their rights and interests in the company. That is precisely the kind of injury the statute contemplates; brought by precisely the kind of party the statute empowers to sue. *See generally Meiselman v. Meiselman*, 309 N.C. 279 (1983).

Even so, the Business Court held that the Maucks lacked standing because, in its view, the Shareholder Agreement's buyout provision displaced their right to seek

judicial dissolution. But that goes to whether the Maucks have stated a claim for relief—not whether they have standing. The question at the threshold is whether the Maucks allege a legal injury under a statute that authorizes them to sue. They do.

By invoking a right secured by N.C.G.S. § 55-14-30(2)(ii) and alleging facts that, if true, entitle them to assert its cause of action, the Maucks have shown the kind of "legal injury" that confers standing. The Business Court erred in holding otherwise.

### 2. *Failure to state a claim under Rule 12(b)(6).*

Still, the Business Court correctly dismissed the Maucks' claim for judicial dissolution. We may sustain a lower court's judgment when its result is correct, even if its reasoning falls short. *Orlando Residence, Ltd. v. All. Hosp. Mgmt., LLC*, 375 N.C. 140, 149–50 (2020). Here, then, we affirm the dismissal—not for lack of standing, as the Business Court held, but under Rule 12(b)(6). The complaint, read alongside the Shareholder Agreement, fails to state a viable claim for judicial dissolution.

We reach that conclusion using the familiar Rule 12(b)(6) framework. A motion under that rule tests the legal sufficiency of a claim. *Bridges*, 366 N.C. at 541. Dismissal is proper when the complaint, on its face, shows that "no law supports [the] claim," that it lacks facts needed "to make a good claim," or that the facts alleged defeat it outright. *Jackson v. Bumgardner*, 318 N.C. 172, 175 (1986). We accept well-pleaded facts as true and view them "in the light most favorable to the non-moving

party." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017) (cleaned up). Our review also reaches documents central to the claim that are "attached to the complaint and incorporated therein by reference." *Ladd v. Est. of Kellenberger*, 314 N.C. 477, 482 (1985) (considering a will attached to the complaint to decide whether plaintiffs adequately plead claims for equitable adoption and breach of contract under Rule 12(b)(6)). Even under our liberal pleading rules, a plaintiff must allege enough to meet the essential elements of a claim. *Stanback v. Stanback*, 297 N.C. 181, 204 (1979). We therefore do not credit bare legal conclusions or "unwarranted deductions of fact." *Wray v. City of Greensboro*, 370 N.C. 41, 46 (2017) (cleaned up).

The Maucks bring a *Meiselman* claim, so named for our decision in *Meiselman v. Meiselman*, 309 N.C. 279 (1983). As minority shareholders in a closely held corporation, they allege that their reasonable expectations have been thwarted. That claim finds statutory footing in N.C.G.S. § 55-14-30(2)(ii), which allows a court to dissolve a corporation when liquidation is "reasonably necessary" to protect a shareholder's "rights or interests." Those "rights or interests," *Meiselman* made clear, include a shareholder's reasonable expectations "embodied in understandings, express or implied, among the participants." *Meiselman*, 309 N.C. at 298–99.

The logic behind this remedy is sound. As *Meiselman* explained, minority shareholders in close corporations are uniquely "vulnerable to exploitation by the majority shareholders." *Id.* at 291–92. They cannot offload their shares on the open market, as can shareholders in public corporations. *Id.* Their investment is often

"imprisoned in the enterprise." *Id.* at 292 (cleaned up). The "illiquidity of a minority shareholder's interest" means that when trust breaks down and expectations are upended, they may be left in a "remediless situation" with no way out. *Id.* at 291–92.

Our judicial dissolution statutes aim to protect vulnerable shareholders, but they do so with care. Dissolution is not an automatic fix. The same statute that authorizes dissolution also tempers it with equitable judgment; courts "may"—not must—dissolve a corporation on listed grounds. N.C.G.S. § 55-14-30 (2023). That discretion reflects both the gravity of the remedy and the equitable principles that shape it. *See Meiselman*, 309 N.C. at 297.

Judicial dissolution is, by design, strong medicine. By a court's order and under its supervision, the corporation is brought to a close—its affairs wound up, its assets sold, and its remnants distributed. *See* N.C.G.S. § 55-14-33 (2023); *see also* N.C.G.S. § 55-14-05 (2023). *Meiselman* made clear that this relief, though authorized by statute, must be measured out according to the equities of each case. *Meiselman*, 309 N.C. at 297. In that case, we held that courts must consider "all of the circumstances surrounding the parties" and weigh "the actual benefit and injury to all of the shareholders resulting from dissolution or other possible relief." *Id.* at 296–97 (cleaned up).[1] This "balancing process" ensures that court-ordered remedies do not

---

[1] Our mention of "other possible relief" in *Meiselman* drew from the particular language of the North Carolina Business Corporation Act in effect at the time. *See Mieselman*, 309 N.C. at 299–301. That version of the Act entrusted the trial court with discretion to "make such order or grant such relief, other than dissolution, as in its discretion it deems appropriate . . . as an alternative to a decree of dissolution." N.C.G.S. § 55-125.1

come at the unjustified "expense of the corporation and without regard to the rights and interests of the other shareholders." *Id*. at 297. We reaffirm that sound principle.

To state a *Meiselman* claim, then, a plaintiff must allege facts showing: (1) a reasonable expectation known to or assumed by the majority; (2) frustration of that expectation; (3) that the frustration occurred through no fault of the plaintiff and was largely beyond the plaintiff's control; and (4) that, under all the circumstances, judicial dissolution[2] is warranted and reasonably necessary to protect the shareholder's interests.

The complaint here satisfies the first three elements. The Maucks allege a reasonable expectation of continued involvement in the management of Cherry Oil, based on their long tenure and active role in the business. They claim that the Cherrys shut them out of management decisions and improperly attempted to force

---

(1982), *rewritten by*, An Act to Rewrite Chapter 55 of the General Statutes Relating to Business Corporations, ch. 265, § 1, 1989 N.C. Sess. Laws 566, 566–679.

The current version of the Act does not contain this same broad discretionary mechanism. In its place, there is a mechanism for a corporation to avoid dissolution by opting to purchase the complaining shareholder's shares at their fair value, but this can only take place "after" "the court determines that dissolution would be appropriate." N.C.G.S. § 55-14-31(d) (2023).

The implication of this statutory change is that a shareholder cannot state a claim for judicial dissolution under N.C.G.S. § 55-14-30(2)(ii) by merely alleging that a supervised share repurchase under N.C.G.S. § 55-14-31(d) is appropriate. A plaintiff must allege facts that show judicial dissolution itself is warranted. *See Brady v. Van Vlaanderen*, 261 N.C. App. 1, 5–6 (2018) ("The only equitable remedy a trial court may award is dissolution."), *disc. rev. denied*, 372 N.C. 57 (2019). Only "after" the court makes that determination can a corporation opt to repurchase its shares and escape dissolution. N.C.G.S. § 55-14-31(d).

[2] Given the statutory amendments discussed in footnote 1, a plaintiff must adequately allege entitlement to judicial dissolution, under all the circumstances, in order to state a *Meiselman*-style claim under N.C.G.S. § 55-14-30(2)(ii).

a buyout. And they say this happened through no fault of their own. But the complaint falters on the final element. It alleges no facts showing that dissolution is reasonably necessary to vindicate the Maucks' expectations of continued involvement in corporate management or that dissolution is equitably warranted under the circumstances. In fact, the complaint discloses an enforceable contractual remedy that is vastly superior, in this circumstance, to the relief dissolution would provide.

That remedy lies in the Shareholder Agreement the Maucks and the Cherrys signed in 1998. The Shareholder Agreement governs how shares are held, how they are valued, and under what conditions they may be transferred. Section 11 provides a put and call mechanism—an exit strategy for when the relationship goes south. Under that provision, the Maucks may "put" their shares to Cherry Oil and compel the company to buy them at fair market value. The company, for its part, may "call" those shares—again at fair market value and subject to procedural safeguards. An appraisal process is built in to determine the price, and the Shareholder Agreement expressly authorizes either party to seek specific performance. According to the complaint, Cherry Oil has already invoked that provision and moved to buy out the Maucks.

That means the Maucks are not trapped in the kind of "remediless situation" *Meiselman* sought to prevent. *Meiselman*, 309 N.C. at 291. The Shareholder Agreement gives them a way out—on demand, at fair value. It lets them exit the business, recover their investment, and leave a corporate relationship they no longer

wish to keep. In short, it offers the very liquidity that judicial dissolution is meant to provide.

Judicial dissolution, too, would liquidate the Maucks' interest in Cherry Oil. But it would do so by ending the corporation altogether. The company would be forced to wind down, sell its assets, and distribute the proceeds to shareholders in proportion to their interests. *See* N.C.G.S. § 55-14-33; *see also* N.C.G.S. § 55-14-05. The outcome for the Maucks is much the same as under the Shareholder Agreement: they recover the value of their investment and sever their ties with the company. But the two remedies differ, quite obviously, in scope and fallout. The contractual buyout under the Shareholder Agreement is precise and contained. It resolves an intra-shareholder dispute through a mechanism the parties themselves created. Dissolution is broader and blunter. It reaches beyond the Maucks to touch employees, creditors, and the corporation itself. Despite those asymmetric equities, the complaint gives no reason why the more sprawling relief is "reasonably necessary," N.C.G.S. § 55-14-30(2)(ii), when a more tailored substitute is not only available, but already underway.

The Maucks respond that their expectations extend beyond the Shareholder Agreement and include more than the value of their stock. They claim an expectation of continued participation in managing the corporation. That interest, we have recognized, may support a *Meiselman* claim. *Meiselman*, 309 N.C. at 301–02. But the Maucks never explain how dissolving Cherry Oil would protect—or restore—that alleged expectation. If anything, the logic cuts the other way. Dissolution would not

preserve their role in management; it would erase the very entity they seek to manage. A dissolved corporation has no business to run. And the Maucks give no reason why judicial dissolution would vindicate their expectations any differently than the contractual remedy already in motion. Dissolution or buyout, the bottom line in this case is materially the same: the Maucks part ways with the company and lose any role in running it. The difference is that one remedy ends the business entirely, while the other allows it to go on. Because the complaint shows that the available remedies differ sharply in their "actual benefit and injury to all of the shareholders," *id.* at 297 (cleaned up), the Maucks had to plead facts showing why they were still entitled to judicial dissolution over the contractual remedy in hand. They did not.

Our decision, we emphasize, is narrow. We do not hold that buy-out provisions in shareholder agreements defeat dissolution claims across the board. We do not limit a minority shareholder's "reasonable expectations" to the four corners of the governing documents. And we do not suggest that dissolution is off the table when liquidation is "reasonably necessary" to protect a shareholder's rights or interests. Instead, we simply conclude that the Maucks' complaint alleges no such reasonable necessity. It fails to show why, under "all of the circumstances of the case," *Meiselman*, 309 N.C. at 301, the Maucks are entitled to the equitable remedy of dissolution—especially when a guaranteed contractual remedy, materially equivalent in its benefits to the Maucks, is already underway. We therefore affirm

the Business Court's dismissal, not for lack of standing, but for failure to state a claim under Rule 12(b)(6).

**B. The remaining claims addressed by the Business Court**

Setting aside the Maucks' judicial dissolution claim, the Business Court dismissed several others under Rule 12(b)(6). These included the Maucks' individual claims for constructive fraud and a constructive trust; Armistead's contract claim against Jay; and a series of derivative claims—for gross negligence, willful misconduct, breach of fiduciary duty, constructive fraud, and the removal of Jay and Ann as directors under N.C.G.S. § 55-8-09. Only two claims survived the pleadings stage: the Maucks' individual claims against the Cherrys for breach of fiduciary duty and for breach of contract. After discovery, however, the Business Court granted summary judgment on those claims as well.

These rulings are "highly fact-bound" and apply settled law to the "evidence presented in the case." *Vanguard Pai Lung, LLC v. Moody*, 387 N.C. 376, 384 (2025). Rehashing the Business Court's analysis would "not meaningfully add to our jurisprudence." *Id.* at 385. We see no reason to disturb the Business Court's decisions and therefore affirm its judgments on these additional claims.

## IV. Conclusion

For the reasons given, we modify and affirm the Business Court's dismissal of the Maucks' judicial dissolution claim. We otherwise affirm the Business Court on the issues appealed.

MODIFIED AND AFFIRMED.

Justice RIGGS did not participate in the consideration or decision of this case.

Chief Justice NEWBY concurring in part and concurring in the result only in part.

I agree with the outcome reached by the majority opinion on all issues. I write separately, however, to clarify exactly why plaintiffs' claim for judicial dissolution is properly dismissed for failure to state a claim upon which relief can be granted. The judicial dissolution claim fails because the complaint discloses a fact that necessarily defeats the claim: the existence of a shareholder agreement with a "put/call provision" that protects plaintiffs' rights and interests as minority shareholders. Therefore, plaintiffs' claim for judicial dissolution does not fail just because the "complaint alleges no . . . reasonable necessity" for judicial dissolution under subdivision 55-14-30(2)(ii). I respectfully concur in part and concur in the result only in part.

Although Rule 12(b)(6) requires the dismissal of a complaint that "[f]ail[s] to state a claim upon which relief can be granted," N.C.G.S. § 1A-1, Rule 12(b)(6) (2023), its sole purpose is to "test the legal sufficiency of the pleading, . . . not the facts which support it," *White v. White*, 296 N.C. 661, 667, 252 S.E.2d 698, 702 (1979) (quoting *Niece v. Sears, Roebuck & Co.*, 293 F. Supp. 792, 794 (N.D. Okla. 1968)). When considering a Rule 12(b)(6) motion, courts treat the complaint's allegations as true, view them in the light most favorable to the plaintiff, and construe the complaint liberally. *Howell v. Cooper*, No. 252A23, slip op. at 10 (N.C. Aug. 22, 2025). Dismissal under Rule 12(b)(6) is properly granted "only when (1) it appears certain that

-20-

plaintiffs could prove no set of facts that would entitle them to relief under some legal theory; (2) no law exists to support the claim made; or (3) *the complaint on its face discloses facts that necessarily defeat the claim." Id.* at 10 (emphasis omitted and added).

Turning to the substantive law at issue, plaintiffs brought a judicial dissolution claim pursuant to N.C.G.S. § 55-14-30(2)(ii). Under subdivision (2)(ii), a "superior court may dissolve a corporation: . . . (2) [i]n a proceeding by a shareholder if it is established that . . . (ii) liquidation is *reasonably necessary for the protection of the rights or interests of the complaining shareholder*." N.C.G.S. § 55-14-30(2)(ii) (2023) (emphasis added). By its plain terms, subdivision (2)(ii) requires a superior court to determine whether liquidation is reasonably necessary to protect the rights or interests of the complaining shareholder. And naturally, reasonable necessity is contingent upon the rights or interests of the complaining shareholder being unprotected.

Relevant here, N.C.G.S. § 55-7-31(b) provides,

> Except for public corporations, an agreement among the shareholders that complies with this section and does any or all of the following is effective among the shareholders and the corporation even though it is inconsistent with one or more of the provisions of [Chapter 55]:
>
> . . . .
>
> (8) Otherwise governs the exercise of the corporate powers or the management of the business and affairs of the corporation or the relationship between or among the shareholders, the directors, or the

corporation and is not contrary to public policy.

*Id.* § 55-7-31(b)(8). In other words, shareholders in a non-publicly traded corporation have broad authority to define corporate power or management by shareholder agreement. This authority is subject only to the condition that it does not contravene public policy. *Id.*

Turning to the complaint in this case, plaintiffs disclosed the existence of a non-publicly traded corporate shareholder agreement. That shareholder agreement includes the following provision:

> Section 11: <u>Put/Call</u>. Subject to the preceding provisions of this Agreement, each Shareholder (or his legal representatives) shall have the right to submit to the Corporation a written offer to sell (i.e. "put") all, but not less than all, of his Shares for the prices specified in Section 6 and upon the terms specified in Section 7. Within thirty (30) days after receipt of such offer, the Corporation shall elect either to purchase all such Shares or to dissolve, signifying its election by a written notice delivered to the subject Shareholder. If the Corporation shall elect to purchase all such Shares, such notice shall fix a closing date not more than sixty (60) days after the receipt of such offer. In the event the Corporation shall elect to dissolve in the circumstances described in this Section 11, the liquidation shall be instituted promptly, but shall be effected in such a manner as to minimize the normal losses attendant upon a liquidation.
>
> Subject to the preceding provisions of this Agreement, the Corporation shall have the right to purchase (i.e. "call") from each Shareholder (or his legal representative) all, but not less than all, of his Shares for the price specified in Section 6 and upon the terms specified in Section 7. If the Corporation shall elect to purchase all such Shares, the Corporation shall provide notice to the Shareholder whose Shares are called (or his legal

representative), which such notice shall fix a closing date not more than sixty (60) days after the receipt of the same.

The Shareholder subject to a put or call shall vote, and take any other necessary action, in accordance with the vote of the Shareholders owning a majority of the remaining Shares.

Section 6 then provides two methods for specifying a price: agreement or fair market value.

This put/call provision is an agreed-upon mechanism to protect the shareholders' respective rights and interests, explicitly providing buyout procedures in lieu of dissolution. Such a provision does not contravene public policy.[1] By virtue of the put/call provision's existence, plaintiffs have contractually secured for themselves protection of their rights and interests in the event that their relationship with defendants deteriorates.[2] Accordingly, judicial dissolution is not reasonably

---

[1] In fact, the protection provided in the shareholder agreement could be equal to that afforded under the North Carolina dissolution statute. *See* N.C.G.S. § 55-14-31(d) (2023) ("[T]he court shall not order dissolution if, after [a determination that dissolution would be appropriate], the corporation elects to purchase the shares of the complaining shareholder at their fair value . . . ."). The degree of similarity between the protection provided in the shareholder agreement and that under the dissolution statute, however, is not determinative in this action. We note, however, that as traditionally understood, "fair market value" and "fair value" are not the same measure of value. *See, e.g.*, *id.* § 55-13-01(5) (defining "[f]air value" as "[t]he value of the corporation's shares . . . without discounting for lack of marketability or minority status" in the context of a dissenting shareholder's right to appraisal remedies). Under North Carolina's dissolution statute, however, "fair value" is left to the court's discretion, which could include fair market value. *See id.* § 55-14-31(d) (providing that "fair value" shall be "as determined in accordance with such procedures as the court may provide").

[2] Accordingly, the *Meiselman* inquiry conducted by the majority opinion is unnecessary. Here the concerns for unprotected minority shareholders in closely-held corporations articulated in *Meiselman v. Meiselman*, 309 N.C. 279, 307 S.E.2d 551 (1983), have been fully addressed by Chapter 55. And in this case, given that plaintiffs negotiated

necessary.

In summary, although section 55-14-30 provides a statutory "backstop" to ensure that minority shareholders in non-publicly traded corporations are protected, shareholders are free to negotiate other protections in their shareholder agreements pursuant to subdivision 55-7-31(b)(8). And so long as those agreements do not violate public policy, shareholders should expect the courts of this State to enforce those bargained-for protections. Plaintiffs negotiated and signed a shareholder agreement, and the put/call provision means that plaintiffs' rights and interests are not unprotected. As the Business Court aptly explained, "the Put/Call Provision . . . reflects a bargained-for agreement between the shareholders that a shareholder's right to receive fair market value for his or her shares is sufficient to protect the 'reasonable expectations' of minority shareholders such as [plaintiffs]." Accordingly, plaintiffs' complaint discloses a fact that necessarily defeats their claim for judicial dissolution, meaning dismissal under Rule 12(b)(6) was proper. To the extent any of the majority's Rule 12(b)(6) analysis is at variance with this reasoning, I do not join it. I therefore respectfully concur in part and concur in the result only in part.

Justice BARRINGER joins this concurring in part and concurring in the result only in part opinion.

---

and secured protections for themselves and their rights and interests, there is no need to invoke Chapter 55's protections.